**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| INDEPENDENT FINANCIAL SERVICES, INC., | : | |
| Plaintiff, | : | |
| v. | : | C.A. No. 04-0378-L |
| CCI GROUP, INC., | : | |
| Defendant. | : | |

**DEFENDANT CCI GROUP INC.'S MOTION FOR SUMMARY JUDGMENT**

Defendant CCI Group, Inc. ("CCI") hereby moves for summary judgment, pursuant to Fed. R. Civ. P. 56, on all counts against it in the Amended Complaint in this action. In support hereof, CCI submits the accompanying Memorandum of Law and Statement of Undisputed Material Facts.

CCI GROUP, INC.

By their Attorneys,

/Mark W. Freel (#4003)
Jillian S. Folger-Hartwell (#6970)
EDWARDS & ANGELL, LLP
2800 Financial Plaza
Providence, Rhode Island 02903
(401) 274-9200
(401) 276-6611 Telecopy

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| INDEPENDENT FINANCIAL SERVICES, INC., | : | |
| Plaintiff, | : | |
| v. | : | C.A. No. 04-0378-L |
| CCI GROUP, INC., | : | |
| Defendant. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT CCI GROUP'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56 and Local Rule 12.1, Defendant CCI Group, Inc. ("CCI"), submits this memorandum of law in support of its motion for summary judgment on all counts.

**Facts**

CCI is in the business of owning and operating certain resort properties located in the Caribbean. (See Statement of Undisputed Material Facts ("Facts") at ¶ 1.) In connection with its desire to purchase additional resort properties in 2004, CCI was in the process of seeking sources of funding or financing. (Facts at ¶ 6.) As a result, CCI became aware of Plaintiff Independent Financial Services, Inc. ("IFS"), which claimed to be in the business of arranging for certain types of financing, including the private placement of securities, through an independent network of agents. (See Facts at ¶ 7.) CCI also became independently aware of the existence of Laurus Master Fund, Ltd. ("Laurus"), a New York-based source of funding. (See Facts at ¶ 12.) As a result, Mark Casolo ("Casolo"), the Chairman and acting Chief Financial Officer of CCI, spoke

to Eugene Grin ("Grin") of Laurus about CCI's interest in funding before either Grin or Casolo spoke with IFS. (See Facts at ¶ 4, 12.)

On or about May 12, 2004, Casolo had an initial telephone call with Richard Herriott ("Herriott") of IFS about the extent to which IFS might be able to assist CCI in locating sources of funding. (See Facts at ¶ 8.) During that phone call, Herriott referred to IFS' experience with funding through the private placement of securities, and to IFS' access to a network of independent agents. (See Facts at ¶ 9.) Following that call, CCI provided IFS with certain information and documentation, including a private placement memorandum ("PPM") related to the sale of certain subordinated notes and of other CCI securities. (See Facts at ¶ 10.) The transmittal letter from Casolo to IFS indicated that the underlying "deal structure" would involve securities. (See Facts at ¶ 10.) Upon receipt of that information, and other subsequent references to the structure of the underlying deal, IFS continued to express interest in being of assistance to CCI, and never indicated in any way that it would be unable to assist in such a transaction. (See Facts at ¶ 11.) Therefore, CCI reasonably assumed, and was led to believe, that IFS was a registered broker-dealer for purposes of receiving any commissions or fees on such a transaction.

On or about June 17, 2004, CCI and IFS entered into a letter agreement (the "Letter Agreement") whereby CCI agreed to compensate IFS on certain terms set forth therein. (Facts at ¶ 13.) Under the terms of the Letter Agreement, if IFS successfully negotiated on CCI's behalf and obtained financing, including from Laurus, then IFS would receive a fee equal to four percent (4%) of the total sum acquired, as well as issuance of certain common stock in CCI, subject to other terms and conditions set forth therein. (Facts at ¶ 14.) Prior to entering into the Letter Agreement, IFS represented to CCI that it had prior dealings with Laurus in securing financing for other companies, and therefore would be of great assistance to CCI in negotiating a

transaction with Laurus. (Facts at ¶ 16.) The Letter Agreement specifically noted that no fees would be payable to IFS until such time as any funds made available from Laurus were "draw[n] down." (See Facts at ¶ 15.)

CCI and Laurus ultimately entered into and closed a Securities Purchase Agreement (the "Securities Agreement") on or about July 29, 2004. (Facts at ¶ 18.) Under the terms of the Securities Agreement, CCI received, among other things, the sum of $10.5 million through a convertible term note. The note was "convertible" in the sense that it could be converted into stock or securities at Laurus' option. (See Facts at ¶ 19.) In addition, CCI agreed to issue Laurus certain other securities in the form of stock options and stock purchase warrants. (Facts at ¶ 19.)

Between June 18, 2004, and July 29, 2004, IFS did not take any steps to pursue the Laurus transaction on CCI's behalf. (See Facts at ¶ 20.) IFS had minimal contact with Laurus, and all negotiations were conducted directly between representatives of CCI (other than IFS) and Laurus. (See Facts at ¶ 20.) By Herriott's own admission, IFS never negotiated any aspects of the transaction on CCI's behalf during that time frame. (See Facts at ¶ 20.) Moreover, sometime at or around the closing, CCI learned for the first time that IFS was not a registered broker-dealer for purposes of receiving commissions from the placement or sale of securities, consistent with the rules and regulations of the Securities and Exchange Commission ("SEC"), the National Association of Securities Dealers ("NASD"), or Federal or state law. (Facts at ¶ 21.) Based on the foregoing, and the clear structure of the underlying transaction, CCI concluded, in consultation with Laurus, that IFS was not eligible for receipt of any fees or commissions from this transaction, and that, in fact, payment of any such fee would be improper and illegal under federal and state securities laws, notwithstanding pre-existing references in some of the transactional documents to payment of such a fee. (Facts at ¶ 22.)

For approximately nine (9) months after consummation of the Laurus financing, no funds were "draw[n] down" by CCI because none of the underlying conditions for use of the funds in the Securities Agreement had been met. (See Facts at ¶ 23.) In the meantime, interest charges on the available funds were accruing, but were not yet payable by CCI to Laurus. (See Facts at ¶ 24.) On or about April 27, 2005, CCI drew down $4.7 million of the original $10.5 million, on terms acceptable to Laurus under the Securities Agreement. (See Facts at ¶ 25.) Those were the only funds ever "drawn down" from the original $10.5 million made available to CCI by Laurus pursuant to the terms of the Securities Agreement. (Facts at ¶ 25.) Shortly thereafter, the balance in the amount of approximately $5.55 million was returned to Laurus on terms negotiated and agreed to by and between CCI and Laurus. (See Facts at ¶ 26.) Thus, of the original $10.5 million made available to CCI by Laurus pursuant to the terms of the Securities Agreement, $5.55 million were never drawn down or used in any way and therefore are not subject to any fee claim under the terms of the Letter Agreement. (See Facts at ¶ 27.)

**Standard of Review**

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, this Court shall render summary judgment when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." The critical question for the Court is whether a genuine issue of material fact exists. Harvey v. Snow, 281 F. Supp. 2d 376, 382 (D.R.I. 2003). In making this determination, the Court must view the facts in the light most favorable to the nonmoving party. Id. The party opposing summary judgment must do more than rest on mere allegations or denials in its pleadings. See Lewis v. Casey, 518 U.S. 343, 355 (1996); Cardillo v. Cardillo, 360 F. Supp. 2d 402, 409 (D.R.I. 2005). The non-moving party must set forth specific evidence, in the form of affidavits and/or other proof, which show that a genuine issue of

material fact is in dispute. See Lewis, 518 U.S. at 355; Cardillo, 360 F. Supp. 2d at 409. If the moving party, however, can demonstrate that no material facts are in dispute, and it is entitled to judgment as a matter of law, the Court must enter judgment in its favor. See Harvey, 281 F. Supp. 2d at 382.

## Discussion

### I. IFS' Obligations Under the Agreement Required It to Be a Registered Broker-Dealer Pursuant to 15 U.S.C.A. § 78o(a)(1).

It is undisputed that IFS is not a registered broker-dealer, as required by section 15(a)(1) of the Securities Exchange Act of 1934 (the "Act"), 15 U.S.C.A. § 78o(a)(1). (See Facts at ¶ 3, 21.)[1] In addition, there is no question that, pursuant to the terms of the Agreement, IFS was to act as a "broker," as defined in 15 U.S.C.A. § 78c(a)(4)(A). A "broker" under the Act is "any person engaged in the business of effecting transactions in securities for the account of others." § 78c(a)(4)(A). A "security" includes "any note, stock . . . certificate of interest or participation in any profit-sharing agreement" and "any put, call, straddle, option, or privilege on any security." § 78c(a)(10).

Section 15(a)(1) of the Act, 15 U.S.C.A. § 78o(a)(1), requires that any broker or dealer effecting transactions in securities must be registered in accordance with the Act. That section provides:

> It shall be unlawful for any broker or dealer which is either a person other than a natural person or a natural person not associated with a broker or dealer which is a person other than a natural person (other than such a broker or dealer whose business is exclusively intrastate and who does not make use of any facility

---

[1] The law of the state of New York, where this transaction occurred, also requires brokers or dealers who wish to sell or purchase securities to members of the public within or from the state to register with the department of state and the department of law. N.Y. General Business Law §359-e(2), (3) (McKinney 2004). In addition, Rhode Island state law requires that brokers or dealers of securities be licensed by the Department of Business Regulation. See R.I. Gen. Law § 7-11-201 (1956).

> of a national securities exchange) to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker or dealer is registered in accordance with subsection (b) of this section.

15 U.S.C.A. § 78o(a)(1). The requirement that broker-dealers register pursuant to this section is "of the utmost importance in effecting the purposes of the Act." Eastside Church of Christ v. Nat'l Plan, Inc., 391 F.2d 357, 362 (5th Cir. 1968).

In Regional Properties, Inc. v. Fin. & Real Estate Consulting Co., 752 F.2d 178, 180, 181 (5th Cir. 1985) ("Regional Properties II"), the court found that the defendant, who contracted with a real estate developer to market and structure limited partnerships and attract capital, was a "broker" as defined by the Act. The defendant agreed to structure, package and sell limited partnership interests in several real estate developments, in return for a fee. Id. at 180. The court accepted the lower court's determination that the defendant was engaged as a broker of securities and therefore was required to register pursuant to section 78o(a)(1) of the Act. Id. at 181.

Like the defendant's activities in Regional Properties II, IFS' performance under the Agreement required IFS to be a registered broker-dealer. The terms of the Agreement clearly and unambiguously describe IFS' role as a broker to procure capital for CCI's real estate development. The Agreement provides that "IFS is hereby appointed as Agent . . . to negotiate on behalf of [CCI] to obtain commitments for the financing from [Laurus]." (See Amended Verified Complaint ("Compl."), Exh. A.) The Securities Agreement provides that Laurus will receive "[m]andatory and optional conversion rights" to common stock. (See Compl., Exh. B.) Moreover, CCI issued stock options and stock purchase warrants to acquire common stock, to Laurus in connection with the transaction. (See Compl., Exh. B.) Lastly, under the Agreement, IFS was to receive "equity participation" compensation in the form of common stock. (See

Compl., Exh. A.) Because IFS was to act as an "[a]gent" for CCI, to negotiate the terms of the Securities Agreement, which involved the transfer of securities from CCI to Laurus, IFS was brokering securities as defined in section 78c(a)(4)(A). Thus, like the defendant in Regional Properties II, IFS' performance under the Agreement required IFS to be a registered broker-dealer pursuant to section 15(a)(1) of the Act.

Moreover, the so-called "finder's exception" to the registration requirements of the Act does not apply to IFS, because IFS was, by the very terms of the Agreement, more than a mere finder.[2] See Couldock & Bohan, Inc. v. Societe Generale Sec. Corp., 93 F. Supp. 2d 220, 229 (D. Conn. 2000); see also John Polanin, Jr., The "Finder's" Exception from Federal Broker-Dealer Registration, 40 Cath. U. L. Rev. 787, 789 (1991). The term "finder" is not defined in the Act, but courts have defined it as one who merely puts potential buyers and sellers of securities in contact with one another, in circumstances in which the buyer and seller then complete any resulting transaction between themselves. Couldock, 93 F. Supp. 2d at 229; Rogers v. Ellsworth, 501 S.W.2d 756, 757 (Tex. Ct. App. 1973). In sum, a finder is merely an intermediary to a transaction who brings the parties together in exchange for a fee. Rogers, 501 S.W.2d at 757. Such a finder, however, leaves the ultimate transaction to the principals and therefore his or her function ceases when the negotiations between the parties begin. Id.

Here, it is clear from the terms of the Agreement that IFS was to act as more than a mere finder. As noted above, the terms of the Agreement provide that "IFS is hereby appointed as

[2] Although some courts have recognized the "finder's exception" to certain state securities regulations, see Vero Group v. ISS-Int'l Serv. Sys., 971 F.2d 1178, 1184-88 (5th Cir. 1992); Rogers v. Ellsworth, 501 S.W.2d 756 (Tex. Ct. App. 1973), an exhaustive search of Federal cases has failed to reveal any cases in which a Federal court has recognized that such an exception exists in relation to federal securities regulation. But cf. Couldock & Bohan, Inc. v. Societe Generale Sec. Corp., 93 F. Supp. 2d 220, 229 (D. Conn. 2000) (recognizing that plaintiff "appears to be claiming that it was acting as an agent or 'finder,'" but holding that plaintiff was more than a mere finder). The "finder's exception" theory, rather, appears to have its origin in Securities Exchange Commission administrative decisions that evince an administrative practice of distinguishing between finders and brokers when enforcing the registration requirements of 15 U.S.C.A. § 78o(a)(1) (West 1997). See John Polanin, Jr., The "Finder's" Exception From Federal Broker-Dealer Registration, 40 Cath. U. L. Rev. 787, 794 (1991).

Agent . . . to negotiate on behalf of [CCI] to obtain commitments for the financing from [Laurus]." (See Compl., Exh. A.) (emphases added). If IFS did, therefore, perform under the Agreement, it acted not as a mere intermediary to put CCI and Laurus in contact with each other, thereafter allowing the two entities to negotiate the deal themselves. Rather, the terms of the agreement place IFS squarely in CCI's shoes as an "agent" in order to participate fully in the negotiations on CCI's behalf. As such, IFS is precluded from arguing that it is merely a finder, exempt from the registration provisions of section 78o(a)(1).

It is also impossible for IFS to argue, consistent with the undisputed material facts, that it somehow did not understand the true nature of the underlying transaction. As early as May 12, 2004, Casolo sent confirming correspondence to IFS, following the parties' original telephone call. That letter confirmed that the "deal structure" would involve securities, and included CCI's PPM, which also clearly related to the placement or sale of securities. (See Facts at ¶¶ 8-10.) Upon receipt of that information, IFS never indicated in any way that it would be unable to assist in such a transaction, despite its lack of experience in transactions involving the placement or sale of securities at that time. (See Facts at ¶ 11.) Then, on or about June 30, 2005, IFS became aware of the Laurus "term sheet" or proposal letter, which again made the underlying nature of the transaction abundantly clear. (See Facts at ¶ 17.) Despite references in that document to the placement or sale of securities, and despite a reference in that document to fees that might be payable to IFS in such circumstances, IFS once again never indicated that it would be unable to be involved in this transaction for any reason.

Furthermore, IFS represented to CCI that it had experience in doing transactions with Laurus, and therefore would be of assistance to CCI in that capacity. (See Facts at ¶ 16.) This representation clearly implied that IFS had some experience with transactions involving the

placement or sale of securities. However, despite these statements, IFS took no steps at any time between June 18 and the closing of the Laurus transaction on July 29 to negotiate on CCI's behalf with Laurus, in pursuit of the transaction. (See Facts at ¶ 20.) More than anything else, this was a clear indication of IFS' complete lack of relevant experience or expertise in connection with such a transaction, particularly when viewed in light of IFS' prior statements, the transactional documents referenced above, and language in the IFS-CCI Agreement describing and contemplating IFS' role.

On the basis of the foregoing undisputed material facts, IFS cannot claim any right to a fee from a transaction involving the placement or sale of securities because it is not a registered broker-dealer consistent with applicable state and Federal law, and because the underlying nature of the CCI-Laurus transaction is absolutely clear, and was clear to IFS throughout the relevant time frame. Moreover, it was never contemplated that IFS was merely acting in a role as a "finder" or intermediary. Rather, IFS represented at certain material times, and otherwise led CCI to believe, that it was capable of working on and contributing to such a transaction, and therefore would be authorized to receive any fee payable in that context. The Agreement contemplated that IFS would act as CCI's agent in negotiating the deal. Ultimately, that never happened, as set forth above. Therefore, as a matter of law, IFS is not entitled to receipt of any fee, whether it purports to have been acting as a broker or merely as a finder.

## II. CCI is Entitled to Judgment As a Matter of Law Because the Letter Agreement is Voidable at CCI's Instance, Pursuant to 15 U.S.C.A. § 78cc(b).

The Agreement between IFS and CCI is voidable under federal securities law because IFS is not a registered broker-dealer, as required by section 15(a)(1) of the Act. Section 29(b) of the Act, 15 U.S.C.A. § 78cc(b), makes void any contract that violates the Act's provisions. Pursuant to section 29(b):

> Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract . . . heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract . . . .

15 U.S.C.A. § 78cc(b).

The U.S. Supreme Court has held, in Mills v. Elec. Auto-Lite Co., 396 U.S. 375, 387, 388 (1970), that section 29(b) makes a contract involving the transfer of securities voidable at the instance of the "innocent party." In Mills, the Court held that the language of section 29(b) precludes the "guilty party . . . from enforcing the contract against an unwilling innocent party." Id. at 387; see also Eastside Church, 391 F.2d at 362-63. Similarly, in Regional Properties, Inc. v. Fin. & Real Estate Consulting Co., 678 F.2d 552, 554, 561-62 (5th Cir. 1982) ("Regional Properties I"), the court held that a real estate developer, seeking to rescind its agreement with a broker, had made out a prima facie case for relief pursuant to sections 15(a)(1) and 29(b) of the Act. The plaintiff in Regional Properties I, 678 F.2d at 555, was a real estate development corporation attempting to raise funds for its projects by contracting with the defendant to market and structure limited partnerships and attract capital. The court concluded that the three elements a party must establish to void a contract under section 29(b) are: (1) the party seeking rescission is in contractual privity with the defendant, (2) the contract involved a "prohibited transaction," and (3) the party seeking rescission is in the class of persons the Act was designed to protect. Id. at 559. In assessing the first element, the court held that section 29(b) renders voidable not only "those contracts that 'by their terms' violate the Act," but also "those contracts that are either illegal when made or as in fact performed." Id. at 560. Additionally, the court

noted that Congress intended the Act to protect the public interest, the investor and the purchasers of securities and that the plaintiff corporation was within this class of persons. Id. at 561-62.

Here, as in Regional Properties I, the necessary elements exist for CCI to prevail on its claim as a matter of law. It is undisputed that the parties are in contractual privity. (See Compl., Exh. A.) Likewise, it is clear that the Agreement involved a prohibited transaction. As noted above, the Agreement purports to call for payment of a fee to IFS from a transaction involving the placement or sale of securities. (See Facts at ¶¶ 18-22.) Payment of such a fee in these circumstances is clearly prohibited. See 15 U.S.C.A. § 78cc(b); Regional Properties I, 678 F.2d at 562. Lastly, like the plaintiff in Regional Properties I, CCI is seeking to raise funds for certain real estate projects by attracting investors. As such, CCI is within the class of persons that the Act was intended to protect. Thus, the elements necessary to void the Agreement, as outlined in Regional Properties I, are present here and CCI is entitled to such a remedy as a matter of law.

IFS will presumably argue that the clear language of the parties' Agreement requires CCI to pay IFS a fee, and that CCI was fully aware of that requirement throughout the relevant time frame. However, CCI was reasonably led to believe, by all of the relevant circumstances, including IFS' silence in the face of clear indications that this transaction involved the placement and sale of securities, that IFS was legally capable of and authorized to receive fees from such a transaction. However, once it became clear that IFS was not a registered broker-dealer for purposes of receiving such a fee, any obligation by CCI to pay such a fee under the terms of the Agreement became voidable as a matter of law consistent with the holdings with Mills and Regional Properties I. Accordingly, CCI is entitled to summary judgment in its favor, and any

purported obligation to pay IFS a fee pursuant to the terms of the Agreement must be declared null and void as a matter of law.

## III. IFS is Not Entitled to Any Fee to the Extent Funds Were Not "Drawn Down"

Under the express terms of the parties' Agreement, IFS is not entitled to payment of any fee until or unless funds are "draw[n] down." The Agreement specifically noted that fees would not be payable to IFS until such time as any funds were "draw[n] down," if that occurred subsequent to closing. (Facts at ¶ 15.) Because CCI never drew down or used a substantial portion of the funds it received from Laurus pursuant to the Securities Agreement, IFS is not, under any circumstances, entitled to fees based on those funds.

For approximately nine (9) months after consummation of the Laurus financing, no funds were "draw[n] down" by CCI because none of the underlying conditions for use of the funds in the Securities Agreement had yet been met. (Facts at ¶ 23.) On or about April 27, 2005, CCI drew down $4.7 million of the original $10.5 million, on terms acceptable to Laurus pursuant to the Securities Agreement. Other than fees paid to Laurus, those were the first and only funds ever "draw[n] down" from the original $10.5 million made available under to the terms of the Securities Agreement. (Facts at ¶ 25.) Shortly thereafter, the balance in the amount of approximately $5.55 million was returned to Laurus on terms negotiated and agreed to by and between CCI and Laurus. (Facts at ¶ 26.) Thus, of the original $10.5 million made available to CCI by Laurus pursuant to the terms of the Securities Agreement, $5.55 million were never drawn down or used in any way. (Facts at ¶ 27.) As such, under the terms of the Agreement, IFS is not entitled to any fees due on that portion of the funds – $5.55 million – that was returned to Laurus.

**Conclusion**

There is no dispute in this case that IFS is not a registered or licensed broker-dealer, as required by the Securities Exchange Act of 1934, section 15(a)(1), 15 U.S.C.A. § 78o(a)(1) and state law. In addition, there is no question that, pursuant to the terms of the Agreement, IFS was to act as a "broker," as it is defined in section 78c(a)(4)(A). Thus, IFS is in violation of section 15(a)(1) of the Act, 15 U.S.C.A. § 78o(a)(1), which requires any broker or dealer effecting transactions in securities to be registered with the Securities & Exchange Commission. Moreover, the so-called "finder's exception" to the registration requirements of the Act does not apply to IFS because IFS is, by the clear and unambiguous terms of the Agreement, more than a mere finder. CCI is entitled to judgment as a matter of law, because the Agreement between IFS and CCI is voidable under section 29(b) of the Act. Therefore, for reasons set forth herein, summary judgment in favor of CCI should be granted as a matter of law.

CCI GROUP, INC.

By their Attorneys,

Mark W. Freel (#4003)
Jillian S. Folger-Hartwell (#6970)
EDWARDS & ANGELL, LLP
2800 Financial Plaza
Providence, Rhode Island 02903
(401) 274-9200
(401) 276-6611 Telecopy

**CERTIFICATE OF SERVICE**

I hereby certify that on the 21st day of June 2005, I caused a true copy of the within Memorandum of Law in Support of Defendant CCI Group's Motion for Summary Judgment to be delivered by regular mail, postage prepaid, to:

Jeffrey S. Michaelson, Esq.
Michaelson & Michaelson
P. O. Box 622
7454 Post Road
North Kingstown, RI 02852

[signature]