UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| INDEPENDENT FINANCIAL SERVICES, INC., Plaintiff, | : | |
| v. | : | C.A. No. 04-0378-L |
| CCI GROUP, INC., Defendant. | : | |

**DEFENDANT CCI GROUP, INC.'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56 and Local Rule 12.1, Defendant CCI Group, Inc. ("CCI") submits the following Statement of Undisputed Material Facts in support of its motion for summary judgment.

1. CCI is a Utah corporation, with a principal place of business in New York City, and is in the business of owning and operating resort properties located in the Caribbean. (See Deposition of Mark C. Casolo ("Casolo Dep."), attached hereto as Exhibit 1, at pp. 6-12; see also Casolo Affidavit ("Casolo Aff."), attached hereto as Exhibit 2, at ¶ 1; see also Amended Verified Complaint, ("Compl.") at ¶ 7.)

2. Plaintiff Independent Financial Services, Inc. ("IFS") is a Connecticut business with a principal place of business in Westerly, Rhode Island. (Compl. at ¶ 1.) IFS is in the business of providing certain financial services to customers who are seeking commercial financing and funding sources. (See Deposition of Richard Herriott ("Herriott Dep."), attached hereto as Exhibit 3, at pp. 8, 12-14.)

3. IFS is not registered or licensed as a broker/dealer of securities with any state or other governmental body, including, but not limited to, the Securities and Exchange Commission ("SEC") or the National Association of Securities Dealers, Inc. ("NASD"). (See Plaintiff's Answers to Defendant's Interrogatories at ¶ 8, attached hereto as Exhibit 4; see also Herriott Dep., at pp. 75, 138.)

4. Mark C. Casolo ("Casolo") is the Chairman of CCI, and currently acts as its Chief Financial Officer. (See Casolo Dep., at pp. 6-7.)

5. Richard Herriott ("Herriott") is the president of IFS, was a founder of the company, and continues to be a shareholder. (See Herriott Dep., at pp. 5-8.)

6. In connection with its desire to purchase additional resort properties in 2004, CCI was in the process of seeking sources of funding or financing. (See Casolo Dep., at p. 31; see also Compl. at ¶ 9.)

7. As a result, CCI became aware of IFS, which claimed to be in the business of arranging for certain types of financing, including the private placement of securities, through a network of independent insurance agents. (See Casolo Dep., at pp. 28-33.)

8. On or about May 12, 2004, Casolo had an initial telephone call with Herriott about the extent to which IFS might be able to assist CCI in locating sources of funding for the acquisition of new resort properties. (See Herriott Dep., at pp. 32-33, 43; Casolo Dep., at pp. 31-32.)

9. During that phone call, Herriott referred to IFS' experience with the private placement of securities, and to IFS' access to a network of independent agents with such capabilities. (See Casolo Dep., at pp. 31-32.)

10. Following that call, CCI provided IFS with certain information and documentation, including a private placement memorandum ("PPM") related to the sale of certain subordinated notes and of CCI's securities. CCI also sent IFS a letter dated May 12, 2004, confirming that the anticipated "deal structure" would involve securities. (See Herriott Dep., at pp. 47-49; see also Casolo Dep., at pp. 18-20, 31-32, 35.)

11. Upon receipt of that information, IFS continued to express interest in being of assistance to CCI, and never indicated in any way that it would not be able to assist in such a transaction. (See Herriott Dep., at pp. 49-51.) However, IFS has never been involved in transactions involving the placement or sale of securities. (See Herriott Dep., at pp. 9, 50.) Moreover, IFS is not a registered broker/dealer of securities under state or federal law. (See Plaintiff's Answers to Defendant's Interrogatories at ¶ 8; Herriott Dep., at pp. 75, 138.)

12. In or around early May of 2004, CCI became independently aware of the existence of Laurus Master Funds, Ltd. ("Laurus"), a New York-based source of asset-based funding. (See Casolo Dep., at pp. 44-48; see also Deposition of Eugene Grin ("Grin Dep."), attached hereto as Exhibit 5, at pp. 9-10.) Casolo initiated discussions with Eugene Grin ("Grin"), a principal at Laurus, regarding financing for CCI. (See Casolo Dep., at pp. 44-48.)

13. On or about June 17, 2004, CCI and IFS entered into a letter agreement (the "Agreement") whereby CCI agreed to compensate IFS on certain terms set forth therein. (See Compl., Exh. C.)

14. Under the terms of the Agreement, if IFS successfully "negotiat[ed] on behalf of [CCI]" and obtained financing, including from Laurus, then IFS would receive a fee equal to four percent (4%) of the total sum acquired, as well as the issuance of certain common stock in CCI, subject to other terms and conditions of the Agreement. (See Compl., Exh. C.)

15. The Agreement specifically noted that fees would not be payable to IFS until such time as any funds were "draw[n] down," if that occurred subsequent to closing. (Id.; see also Casolo Dep., at pp. 93, 160-61, 182-86.)

16. Prior to entering into the Agreement, IFS represented to CCI that it had prior dealings with Laurus in securing financing for other companies; that it knew how to effect a financing with Laurus; and therefore IFS would be of great assistance to CCI in negotiating a transaction with Laurus. (See Casolo Aff. at ¶ 3.)

17. On or about June 30, 2004, IFS became aware of the Laurus "term sheet" or proposal letter, which made it clear that the underlying transaction involved the placement and/or sale of securities. (See Herriott Dep., at pp. 95-104; see also Laurus Proposal Letter, attached hereto as Exhibit 6.)

18. CCI and Laurus ultimately entered into and closed a Securities Purchase Agreement (the "Securities Agreement") on or about July 29, 2004. (See Compl., Exh. C.)

19. Under the terms of that Securities Agreement, CCI received, among other things, the sum of $10.5 million through a convertible term note. The note was "convertible" in the sense that it could be converted into securities. The transaction also involved the issuance of stock options and warrants to Laurus. (See Compl., Exh. C; see also Casolo Dep., at pp. 107-08.)

20. Between June 18, 2004, and July 29, 2004, IFS did not take any steps to negotiate any aspects of the transaction on CCI's behalf, as contemplated by language in the Agreement. All negotiations were conducted directly between representatives of CCI and Laurus. (See Herriott Dep., at pp. 104-08, 116-18.)

21. Sometime immediately prior to, or immediately following the closing of the Securities Agreement, CCI learned for the first time that IFS was not a registered broker-dealer for purposes of receiving commissions from the placement or sale of securities, consistent with the rules and regulations of the SEC, the NASD, or Federal or state law. (See Casolo Dep., at pp. 105-22.)

22. Based on the foregoing, the clear structure of the underlying transaction, and other considerations, CCI ultimately concluded that IFS was not eligible for receipt of any fees or commissions from this transaction, and that, in fact, payment of any such fee would be improper and illegal, notwithstanding pre-existing references in some of the transactional documents to payment of such a fee. (See Casolo Dep., at pp. 105-22; see also Casolo Aff., at ¶ 6.)

23. For approximately nine (9) months after consummation of the Laurus financing, no funds were "drawn down" by CCI because none of the underlying conditions for use of the funds in the Securities Agreement had yet been met. (See Casolo Dep., at pp. 93, 160-61, 182-86; see also Casolo Aff., at ¶ 7.)

24. In the meantime, interest charges on the available funds were accruing, but were not yet payable by CCI to Laurus. (See Casolo Dep., at pp 152-53.)

25. On or about April 27, 2005, CCI drew down $4.7 million of the original $10.5 million, on terms acceptable to Laurus under the Securities Agreement. Other than fees paid to Laurus, those were the first and only funds ever "drawn down" from the original $10.5 million made available to CCI by Laurus pursuant to the terms of the Securities Agreement. (See SEC Form 8-K, dated April 27, 2005, attached hereto as Exhibit 7; see also Casolo Dep., at pp. 182-86; Casolo Aff., at ¶¶ 7-8.)

26. Shortly thereafter, the balance in the amount of approximately $5.55 million was returned to Laurus on terms negotiated and agreed to by and between CCI and Laurus. (See Casolo Aff., at ¶ 8.)

27. Thus, of the original $10.5 million made available to CCI by Laurus pursuant to the terms of the Securities Agreement, $5.55 million were never drawn down or used in any way and therefore are not subject to any fee claim under any circumstances, pursuant to the terms of the Agreement. (See Casolo Aff., at ¶ 8.)

CCI GROUP, INC.

By its Attorneys,

Mark W. Freel (#4003)
Jillian S. Folger-Hartwell (#6970)
EDWARDS & ANGELL, LLP
2800 Financial Plaza
Providence, Rhode Island 02903
(401) 274-9200
(401) 276-6611 Telecopy

**CERTIFICATE OF SERVICE**

I hereby certify that on the 8th day of July 2005, I caused a true copy of the within Defendant's Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment to be delivered by regular mail, postage prepaid, to:

Jeffrey S. Michaelson, Esq.
Michaelson & Michaelson
P. O. Box 622
7454 Post Road
North Kingstown, RI 02852
(401) 885-7199 (fax)