UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| INDEPENDENT FINANCIAL SERVICES, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 04-378-L |
| CCI Group, Inc., | ) | |
| Defendant. | ) | |

INDEPENDENT FINANCIAL SERVICES, INC.'S
STATEMENT OF DISPUTED/UNDISUPTED FACTS[1]

1. IFS' general business is to bring together individuals or entities seeking financing with a financing source. Herriott Depo., CCI Exh. 3, p.13, l.1 - p.14, l.6.

2. The funding which results from IFS bringing together such parties include loans and equity financing. Herriott Depo., CCI Exh. 3, p.14, l.9 - p.15, l.1.

3. IFS was introduced to CCI in connection with what IFS understood to be CCI's needs for a mortgage financing for the purpose of purchasing boutique-style hotels. Herriott Depo, CCI Exh. 3, p.16, l.13-17.

4. As of May 10, 2004, IFS was of the belief that McGinn, Smith was a registered broker-dealer of securities and an investment banking firm. Herriott Depo., CCI Exh. 3, p.36, l.4-5, 17-21.

5. IFS was aware that Mark Casolo was the Chairman of CCI Group and also related to McGinn, Smith. Herriott Depo., CCI Exh. 3, p.37, l.1-4.

[1] This Statement is so designated because it contains facts which are inconsistent with CCI's recitation of what it terms "undisputed" facts and, in addition, sets forth facts which relate to other matters and are, at this stage, undisputed. In addition, IFS incorporates in its Statement the Verified Amended Complaint, and Exhibits thereto, which were referenced, as well, by CCI in it Memorandum.

6. In early May, 2004, Mark Casolo advised that he needed "funding" in the approximate amount of $25Million over a period of time. The specific discussion was regarding "mortgage financing." Herriott Depo., CCI Exh. 3, p.43, l.7-21.

7. Mr. Herriott does not recall any discussion of financing through any type of security at this time. Herriott Depo., CCI Exh. 3, p.49, l.20-23.

8. The premise of all discussions between IFS and Mr. Casolo was mortgage financing. Herriott Depo., CCI Exh. 3, p.50, l.13-16.

9. Mr. Casolo's interest, at that time was for funding, and the source was not important to him. Herriott Depo., CCI Exh. 3, p.43, l5 - p.44, l.2.

10. IFS received a Private Placement Memorandum that had been prepared by or on behalf of CCI Group, Inc., together with a letter from Mr. Casolo indicating that "the deal structure can be changed to accommodate any type of security including a mortgage[] backed where the property is the collateral." Herriott Depo., CCI Exh. 3, p.49, l.10-14.

11. IFS reviewed the Private Placement Memorandum for the content as it related to real estate investment and background, and not as something IFS would be involved in as a private placement. Herriott Depo., p.55, l.19-23.

12. IFS never represented that it had the infrastructure, knowledge, licensing or background or understanding to produce a private placement for CCI. Herriott Depo., CCI Exh. 3, p.17, l.17-21.

13. The terms of IFS' compensation were that it would be paid 4% cash and an additional fee for services in the form of warrants, which Mr. Herriott understood to be a device whereby, if exercised, stock could be purchased at a set price. Herriott Depo., CCI Exh. 3, p.59, l.6–17, and Depo. Exh.F.

14. Mr. Casolo was seeking equity investment through other investors, and IFS was handling the real estate side. Herriott Depo., CCI Exh. 3, p.50, l.22 - p.51, l.1.

15. Mr. Grin, from Laurus Master Funds had been contacted by both Mr. Casolo and discussed the potential financing with Mr. Wolfe, who was affiliated with IFS (Herriott Depo, CCI Exh. 3, p.16, l.24 - p.18, l.1) and Mr. Grin requested that the matter of fees and representation be resolved in order for Laurus to enter into discussions regarding financing for CCI Group, Inc. Herriott Depo., CCI Exh. 3, p.53, l.1-19.

16. IFS sent a proposed agreement to CCI on June 15, 2004. Herriott Depo., CCI Exh. 3, p.64, l.18-24.

17. While IFS was expecting proposed revisions to its proposed agreement, Mr. Casolo sent, instead, an alternative agreement he wanted IFS to execute. Herriott Depo., CCI Exh.3, p.68, l.6-8.

18. IFS stated, on June 17, 2004, prior to the execution of the ultimate Agreement with IFS that it would not sign the agreement proposed by CCI and told Mr. Casolo at that time that IFS was not a registered broker dealer. Herriott Depo., CCI Exh. 3, p.68, l.8-11. The agreement proposed by CCI was a "broker-dealer type of contract." Herriott Depo., CCI Exh. 3, p.70, l.5-6.

19. IFS never offered to obtain acceptable purchasers of securities offered in an amount up to $25Million. Herriott Depo., CCI Exh. 3, p.76, l.16-23.

20. The IFS Agreement included an additional compensation component which was an equity participation in the event that the lender/financing entity took an equity position in connection with the financing. Herriott Depo., CCI Exh. 3, p.78, l.7-22.

21. Ultimately, an Agreement was entered between IFS and CCI. Verified Complaint, Par. 12

and Exh. A.

22. The Agreement provides that IFS is appointed as agent "to negotiate on behalf of client to obtain commitments for the financing from the institution." Verified Complaint, Exh. A.

23. Thereafter, IFS was involved in transmitting information, communicating loan terms, conveying proposal letters and ultimately involved to the extent necessary with the process up to the term sheet being considered a commitment. Herriott Depo., CCI Exh. 3, p.86, l.16 - p.87, l.6. The information transmitted included a spreadsheet showing cash flow at CCI's existing property and a *pro forma* regarding proposed purchases. Herriott Depo., CCI Exh. 3, p.91, l.3 - 25.

24. The terms which Laurus offered which ultimately became the basis of the commitment were, in essence, a mortgage financing and an equity participation. Herriott Depo., CCI Exh.3, p.89, l.25 - p.90, l.13.

25. The proposal letter from Laurus included a first mortgage on the properties. Herriott Depo, CCI Exh. 3, p.103, l.1-15.

26. After issuance of the commitment, IFS was no longer involved in the negotiation of the specific transaction documents. Herriott Depo., CCI Exh. 3, p.104, l.12-19.

27. IFS did, in fact, negotiate on behalf of CCI to obtain commitments for the financing from Laurus. Herriott Depo., CCI Exh.3, p.105, l.8-16.

28. Mr. Casolo told IFS that the reason IFS was not paid a fee as expected at the closing of the Laurus transaction was because a principal of Laurus refused to make the payment. Herriott Depo., CCI Exh.3, p.129, l.11-13, p.130, l.8-14.

29. Mark Casolo is a Senior Vice President at McGinn Smith and, as well, Chairman of CCI Group, Inc. Casolo Depo., CCI Exh. 2, p.4, l. 8-11, p.6, l.16-17.

30. The Private Placement Memorandum, if successful in raising capital, would not have resulted in any mortgage interest in any subscriber. Casolo Depo., CCI Exh. 2, p.19, 20-25. According to Mr. Casolo, his initial expectation regarding Laurus as a source for funds was an "asset-based transaction" and not financing as contemplated in the private placement memorandum. Casolo Depo., CCI Exh. 2, p.47, l.16-22.

32. Prior to CCI and IFS being associated in any manner, it was Mr. Casolo's understanding that Laurus was not interested in the Private Placement which was set forth in the Private Placement Memorandum. Casolo Depo., CCI Exh.2, p.51, l.22 - p.52, l.13.

33. As part of the closing with Laurus, in excess of $10Million was placed in a restricted account, and CCI began paying interest on that money. Casolo Depo., CCI Exh.2, p.77, l24 - p.78, l.2; p.78, l.9-14.

34. Mr. Casolo admits that Mr. Herriott, of IFS was performing functions in connection with the financing at least to a limited extent, including making sure a check was transmitted which was required by the commitment. Casolo Depo., CCI Exh.2, p.86, l.4-13. Mr. Casolo states that Mr. Herriott made calls checking to see if CCI had anything else it needed to do. Casolo Depo., CCI Exh.2, p.109, l.24 - p.110, l.5.

35. All of the closing documents were drafted by Laurus and reviewed by CCI's counsel. Casolo Depo., CCI Exh.2, p.88, l.3-9.

36. McGinn, Smith's engagement letter called for it to receive 10% of funds raised. Casolo Depo., CCI Exh.2, p.90, l.21 - p.91, l.1.

37. The anticipated fee to McGinn, Smith to be paid at the closing and as set forth in various documents filed with the Securities and Exchange Commission was 4%. Exh. 4, CCI Production, p.00136.

38. The fee to be paid to IFS was described in the closing documents as a commission on the funding resulting from the agreement. Casolo Depo., CCI Exh.2, p. 112, l.21 - p.113, l.3.

39. The closing with Laurus resulted in the funding of the amount of $10.5Million. Of that sum, $10.125Million was placed in a so-called "restricted account" held in the name of CCI Group at North Fork Bank. Exh. 1, CCI production, page 00101.

40. The funds held in the restricted account could only be used for purchases of property up to 60% of the value of such property (lesser of appraised of consideration) and only if a mortgage were perfected in favor of Laurus as part of the transaction. Exh. A, CCI production, p.00111-112.

41. As part of the Laurus closing, Laurus was granted a security interest in all assets of CCI. Exh. A, CCI production, p.00168.

Respectfully submitted,
Independent Financial Services, Inc.,
by its attorney,

Date: 7/8/05

Jeffrey S. Michaelson (#3299)
Michaelson & Michaelson
P.O. Box 622
7454 Post Road
North Kingstown, R.I. 02852
(401)295-4330
(Fax)295-5220

**CERTIFICATE OF SERVICE**

I hereby certify that a true and accurate copy of the foregoing document was mailed, by regular mail, postage prepaid, on this 8 day of July, 2005, to the following attorney(s) of record:

Mark W. Freel
Edwards & Angell, LLP
2800 Financial Plaza
Providence, R.I. 02903

______________________________

①

**CCI Group, Inc.**
**405 Park Avenue, 10th Floor**
**New York, NY 10022**

Joint Instructions

July 29, 2004

Scott Giordano, Esq.
Loeb & Loeb LLP
345 Park Avenue
New York, New York 10154

RE: CCI Group, Inc. (the "Company") – Escrow Release
Gross Escrow Deposit: $10,500,000.00

Dear Mr. Giordano:

These instructions are given to you pursuant to a Funds Escrow Agreement among the Company, Laurus Master Fund, Ltd., and Loeb & Loeb LLP as Escrow Agent. Subject to the terms set forth below, you are instructed to disburse $10,500,000.00 of the investor's funds received by you to and on the Company's behalf as follows:

1. $10,105,500.00 to CCI Group, Inc. Restricted Cash Account pursuant to the following wire instructions:

| | |
|---|---|
| Bank: | North Fork Bank<br>New York, NY 10022 |
| ABA Number: | [redacted]912 |
| For Credit to: | CCI Group, Inc. |
| Account Number: | [redacted]2030 |

2. $367,500.00 to Laurus Capital Management, L.L.C. (for management fees), pursuant to the following wire instructions:

| | |
|---|---|
| Bank: | North Fork Bank<br>New York, NY 10022 |
| ABA Number: | [redacted]912 |
| For Credit to: | Laurus Capital Management, LL.C. |
| Account Number: | [redacted]278 |

3. $24,500.00 to Laurus Capital Management, L.L.C. (for payment in full of all due diligence and documentation fees owing by the Company) pursuant to the following wire instructions:

| | |
|---|---|
| Bank: | North Fork Bank<br>New York, NY 10022 |
| ABA Number: | [redacted]912 |
| For Credit to: | Laurus Capital Management, LL.C. |
| Account Number: | [redacted]278 |

4. $2,500.00 to Loeb & Loeb LLP (for escrow agent fee) pursuant to the following wire instructions:

| | |
|---|---|
| Bank: | Citibank, N.A. |
| ABA No: | [redacted]089 |
| Acct. No.: | [redacted]308 |
| Reference: | Laurus Escrow Arrangement |

Very truly yours,

CCI GROUP, INC.

By: ______________________
Mark Casolo
Chairman

Accepted and Agreed:

Laurus Master Fund, Ltd.

By: ______________________

LAURUS MASTER FUND, LTD.
825 Third Avenue, 14th Floor
New York, New York 10022

(2)

July 29, 2004

CCI Group, Inc.
405 Park Avenue
New York, NY 10022
Attn: Mark Casolo

Re: Restricted Account: Account Number 2704052030,
Account Name: CCI Group, Inc., maintained at North Fork Bank (the "Restricted Account").

Reference is made to (i) that certain Securities Purchase Agreement, dated as of July 29, 2004 (as amended, modified or supplemented from time to time, the "Purchase Agreement"), by and between CCI Group, Inc., a Utah corporation (the "Company"), and Laurus Master Fund, Ltd. (the "Purchaser") and (ii) that certain Restricted Account Agreement, dated as of July 29, 2004 (as amended, modified or supplemented from time to time, the "Restricted Account Agreement"), by and among the Company, Laurus and North Fork Bank (the "Bank"). Capitalized terms used but not defined herein shall have the meanings ascribed them in the Purchase Agreement or the Restricted Account Agreement, as applicable. Pursuant to the Section 3.2 of the Purchase Agreement, the Company is required to place $10,105,500 in the Restricted Account, and, subject to the provisions of this letter, the Purchase Agreement and any Related Agreement, maintain such amount in the Restricted Account for as long as the Purchaser shall have any obligations outstanding under the Note and to assign the Restricted Account for the benefit of the Purchaser as security for the performance of the Company's obligations to the Purchaser.

The Purchaser and the Company desire to clarify certain aspects regarding the use of funds contained in the Restricted Account, and for good consideration, the receipt and sufficiency of which is here acknowledged, the Company and the Purchaser agree that, in connection with the consummation of a Property Acquisition (and as partial cash in consideration therefor), the Purchaser shall direct the Bank, pursuant to a Release Notice (as defined in the Restricted Account Agreement), to wire from the Restricted Account to such bank account as the Company may direct the Purchaser in writing, an amount of funds equal to the lesser of (x) 60% of the Appraised Value (as defined below) of the property acquired in connection with such Property Acquisition (each, an "Acquired Property") and (y) 60% of the total cash consideration paid to the seller in connection with such Property Acquisition (each such release referred to in this sentence, a ("Property Acquisition Release"); provided that a Property Acquisition Release shall only be consummated if (i) no Event of Default then exists or would result therefrom, (ii) the Purchaser has approved the such Property Acquisition following its evaluation of all factors that it considers (in its sole discretion) relevant at the time of such requested Property Acquisition Release, including its determination (I) of the relative benefit of such Property Acquistion to the Company and its Subsidiaries and (II) of the overall performance (financial or otherwise) of the Company and its Subsidiaries at such time, (iii) the Company and its Subsidiaries have complied with Section 6.12(f)

of the Purchase Agreement with respect to such Property Acquisition, (iv) the Purchaser shall have received, from an independent appraiser satisfactory to the Purchaser, an appraisal of the Acquired Property setting forth the fair market value of the Acquired Property (such value, the "Appraised Value"), (v) the Company and/or the relevant Subsidiary thereof shall have (x) executed such mortgages and other security documentation (in each case in form and substance satisfactory to the Purchaser) necessary or desirable in the opinion of the Purchaser to grant to the Purchaser a first priority perfected security interest (or the equivalent thereof) in the Acquired Property and (y) delivered to the Purchaser title insurance, surveys, legal opinions, and/or such other documentation or certificates requested by the Purchaser in connection with the foregoing, (vi) the Company shall have provided evidence to the Purchaser that it is in compliance with Section 6.08 of the Purchase Agreement with respect to the Acquired Property and (vii) the Company shall have paid to the Purchaser all expenses (including the fees and expenses of counsel to the Purchaser) incurred by the Purchaser in connection with the foregoing. Furthermore, for good consideration, the receipt and sufficiency of which is here acknowledged, the Company and the Purchaser agree that, so long as the Amortizing Principal Amount (as defined in the Note) at such time has been reduced (through conversions or otherwise) to $0, promptly following any conversion of a Monthly Principal Amount (as defined in the Note) or such other Principal Amounts into Common Stock of the Company (such event, a "Conversion"), the Purchaser shall direct the Bank, pursuant to a Release Notice (as defined in the Restricted Account Agreement), to wire an amount of funds equal to the corresponding dollar amount by which the aggregate Principal Amount of the Note has been reduced pursuant to such a Conversion from the Restricted Account to such bank account as the Company may direct the Purchaser in writing.

This letter may not be amended or waived except by an instrument in writing signed by the Company and the Purchaser. This letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this letter by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof or thereof, as the case may be. This letter shall be governed by, and construed in accordance with, the laws of the State of New York. This letter sets forth the entire agreement between the parties hereto as to the matters set forth herein and supersede all prior communications, written or oral, with respect to the matters herein.

If the foregoing meets with your approval please signify your acceptance of the terms hereof by signing below.

Signed,

**Laurus Master Fund, Ltd.**

By:____________________
Name:
Title:

Agreed and Accepted this 29th day of July, 2004.

**CCI Group, Inc.**

By:____________________
Name:
Title:

3

# Guide to Broker-Dealer Registration

**Division of Market Regulation**
**U.S. Securities and Exchange Commission**
**August 2004**

**TABLE OF CONTENTS**


I. Introduction
II. Who is Required to Register
   A. Who is a "Broker"
   B. Who is a "Dealer"
   C. What To Do If You Think You May be a Broker or a Dealer
   D. Brokers and Dealers Generally Must Register with the Commission
      1. "Associated Persons" of a Broker-Dealer
      2. Intrastate Broker-Dealers
      3. Broker-Dealers that Limit their Business to Excluded and Exempted Securities
      4. Broker-Dealers Must Register Before Selling Unregistered Securities — Including Private Placements (or Regulation D offerings)
      5. Issuer's Exemption
      6. Foreign Broker-Dealer Exemption
   E. Requirements Regarding Brokers and Dealers of Government and Municipal Securities, and Dealers in Repurchase Agreements
   F. Special Rules That Apply to Banks and Other Financial Institutions
   G. Insurance Agency Networking
   H. Real Estate Broker Networking
   I. Broker-Dealer Relationships with Affinity Groups
III. How to Register as a Broker-Dealer
   A. Form BD
   B. SRO Membership
   C. SIPC Membership
   D. State Requirements
   E. Associated Persons
   F. Successor Broker-Dealer Registration
   G. Withdrawal from Registration
IV. Security Futures
V. Conduct Regulation of Broker-Dealers
   A. Antifraud Provisions
      1. Duty of Fair Dealing
      2. Duty of Best Execution
      3. Customer Confirmation Rule
      4. Disclosure of Credit Terms
      5. Restrictions on Short Sales
      6. Trading During an Offering (Regulation M)
      7. Restrictions on Insider Trading
      8. Restrictions on Private Securities Transactions
   B. Analysts and Regulation AC
   C. Trading by Members of Exchanges, Brokers and Dealers
   D. Extending Credit on New Issues
   E. Order Execution Obligations
   F. Penny Stock Rules

Most "brokers" and "dealers" must register with the SEC and join a ' organization," or SRO. This section covers the factors that determin person is a broker or dealer. It also describes the types of brokers a do not have to register with the SEC. Self-regulatory organizations a Part III, below./P>

**A note about banks**: The Exchange Act also contains special provis brokerage and dealing activities of banks. Please see Sections 3(a)(4 (5)(C) and related provisions, and consult with counsel. Aspects of bank dealer activity are discussed in a publication issued by the SEC's Division of Market Regulation, entitled "Staff Compliance Guide to Banks on Dealer Statutory Exceptions and Rules," which is available on the SEC's website at: http://www.sec.gov/divisions/marketreg/bankdealerguide.htm. Bank brokerage activity will be discussed in a separate publication. Also see Section II.F, below.

### A. Who is a "Broker"

Section 3(a)(4)(A) of the Act generally defines a "broker" broadly as

> any person engaged in the business of effecting transactions in securities for the account of others.

Sometimes you can easily determine if someone is a broker. For instance, a person who executes transactions for others on a securities exchange clearly is a broker. However, other situations are less clear. For example, each of the following individuals and businesses may need to register as a broker, depending on a number of factors:

- "finders," "business brokers," and other individuals or entities that engage in the following activities:
  - Finding investors or customers for, making referrals to, or splitting commissions with registered broker-dealers, investment companies (or mutual funds, including hedge funds) or other securities intermediaries;
  - Finding investors for "issuers" (entities issuing securities), even in a "consultant" capacity;
  - Engaging in, or finding investors for, venture capital or "angel" financings, including private placements;
  - Finding buyers and sellers of businesses (i.e., activities relating to mergers and acquisitions where securities are involved).
- investment advisers and financial consultants;
- foreign broker-dealers that cannot rely on Rule 15a-6 under the Act (discussed below);
- persons that operate or control electronic or other platforms to trade securities;
- persons that market real-estate investment interests, such as limited partnership interests, that are securities;
- persons that act as "placement agents" for private placements of securities;
- persons that market or effect transactions in insurance products that are securities, such as variable annuities, or other investment products that are

securities;

- persons that effect securities transactions for the account of others for a fee, even when those other people are friends or family members;
- persons that provide support services to registered broker-dealers; and
- persons that act as "independent contractors," but are not "associated persons" of a broker-dealer (for information on "associated persons," see below).

In order to determine whether any of these individuals (or any other person or business) is a broker, we look at the activities that the person or business actually performs. You can find analyses of various activities in the decisions of federal courts and our own no-action and interpretive letters. Here are some of the questions that you should ask to determine whether you are acting as a broker:

- Do you participate in important parts of a securities transaction, including solicitation, negotiation, or execution of the transaction?
- Does your compensation for participation in the transaction depend upon, or is it related to, the outcome or size of the transaction or deal? Do you receive trailing commissions, such as 12b-1 fees? Do you receive any other transaction-related compensation?
- Are you otherwise engaged in the business of effecting or facilitating securities transactions?
- Do you handle the securities or funds of others in connection with securities transactions?

A "yes" answer to any of these questions indicates that you may need to register as a broker.

**B. Who is a "Dealer"**

Unlike a broker, who acts as agent, a dealer acts as principal. Section 3(a)(5)(A) of the Act generally defines a "dealer" as:

> any person engaged in the business of buying and selling securities for his own account, through a broker or otherwise.

The definition of "dealer" does not include a "trader," that is, a person who buys and sells securities for his or her own account, either individually or in a fiduciary capacity, but not as part of a regular business. Individuals who buy and sell securities for themselves generally are considered traders and not dealers.

Sometimes you can easily tell if someone is a dealer. For example, a firm that advertises publicly that it makes a market in securities is obviously a dealer. Other situations can be less clear. For instance, each of the following individuals and businesses may need to register as a dealer, depending on a number of factors:

- a person who holds himself out as being willing to buy and sell a particular security on a continuous basis;
- a person who runs a matched book of repurchase agreements; or
- a person who issues or originates securities that he also buys and sells.

4

## SCHEDULE 4.5

1. As disclosed in the Company's Exchange Act Filings, the Company has issued its 12% subordinated notes to Atlantis Investors Income Notes LLC and Atlantis Strategic Total Return Fund, LLC. In addition to amounts disclosed in the Company's Exchange Act Filings, from April 1, 2004 to the date hereof, the Company issued an additional $1,320,950 in subordinated notes to the two funds. Both funds are controlled by the Chairman of the Company. In addition, from April 1, 2004 through the date hereof, the Company borrowed the sum of $500,000 from a third party. The debt is due and payable on demand. The Company will replace this debt with a convertible preferred stock issuable to a fund controlled by the Chairman of the Company within 120 days from the date hereof.

2. On May 1, 2004, McGinn Smith entered into an agreement with the Company in connection with certain financial consulting to be provided to the Company. Under the Agreement, the Company is obligated to pay McGinn Smith 10% of the gross proceeds raised (except that if funds used to acquire all or part of any resort by the Company or its Subsidiaries are from Laurus Master Fund, the fee payable on all funds used to acquire the resort will be 4%), and 5% of the purchase price of any properties acquired by the Company which were introduced by McGinn Smith.

3. The Company is obligated to pay McGinn Smith and Independent Financial Services, each a 4% commission on the funding resulting from this Agreement.

4. The Company is obligated to pay McGinn Smith the sum of $250,000 in connection with the acquisition of the resort in Barbuda.

facts, as construed most favorably to IFS are that it did not solicit, negotiate or execute in any manner a *securities* transaction. As noted by Mr. Herriott, IFS SF Par. 3, 6, 8, IFS sought a loan commitment for a conventional mortgage loan.

Second, **does the party in question's compensation for participation in the transaction depend upon, or is it related to, the outcome or the size of the transaction or deal? Does it receive trailing commissions, such as 12b-1 fees? Does it receive other transaction-related compensation?** As to this factor, the payment, while related to the size of the transaction, was related to the size of the *loan*, as specifically set forth in the Agreement. Comp., Exh. A, IFS SF Par. 13. There was no mention in the Agreement of a securities transaction and, accordingly, the facts, as applied to this factor, do not fit within the scope of the substance of the inquiry.

Third, **is the party in question otherwise engaged in the business of effecting or facilitating securities transactions?** As to this inquiry, the facts are not in dispute. It is clear that IFS is not in the business of effecting or facilitating securities transactions. IFS SF 12, 18, 19.

Finally, the SEC inquires **whether the party in question handles the securities or funds of others in connection with securities transactions.** Again, the facts in this case do not support a finding, under any circumstances that the answer to this question would be "yes" *vis a vis* IFS.

The SEC Guide concludes that, if the answer to any of these four questions is "yes,", the party "*may* need to register as a broker." Exh. 3, at 2, 3(emphasis added). Thus, as noted, construing the facts in the light most favorable to IFS, the answer to each question is "no," and, furthermore, even if the answer were "yes," the result is an equivocal "may" need to register, not the legal slam dunk which would entitle CCI to judgment as a matter of law.

CCI's citation to *Regional Properties II*, 752 F.2d 178, is inapposite to the facts of this case. In *Regional II*, the defendant, Financial & Real Estate Consulting, specifically and unambiguously

entered into an agreement to market *limited partnership interests* in real estate developments. Thus, by the very terms of the agreement, the defendant, in that case, was engaged to market securities. That factual scenario is entirely different from the scenario in this case, where the engagement did not specify the marketing of securities, but, instead, the seeking of a loan commitment. Comp. Exh. A, IFS SF Par. 21. As such, in terms of establishing that IFS was, or was not, engaged in an endeavor which requires registration, *Regional II* is of no help.

In *Couldack*, also cited by CCI, the Plaintiff was effectively brokering trades in non-equity instruments, such as bonds, and using defendant to clear the trades. When the defendant discovered that the Plaintiff, to act in that regard, was required to be a registered broker, the defendant sought to terminate the contract and plaintiff sued. The Court held that the Plaintiff's role did, indeed, require registration and, on that basis, concluded that Defendant was within its rights to terminate the contract. In *Couldack*, the Court recognized the existence of the finder's exception, but found that the Plaintiff, in that case, did not fit within it, because, unlike a finder situation, the 'buyer' and 'seller' of what was undisputedly a security, were never put together to complete their transaction. *See Couldack*, 93 F.Supp.2d at 229. Given that conclusion, the Court needed go no further in its analysis. However, the suggestion that *Couldack's* brief foray into the concept somehow excludes IFS from the definition of a finder, as a matter of law, extends the case far beyond its analytical utility.

For these reasons, there are factual issues regarding whether IFS is a "finder" which would not be required to be registered as a broker even were it otherwise required to do so – which issues, respectfully, IFS submits preclude Summary Judgment in this matter.

**C. <u>The Claim That The Agreement Is Void Is Procedurally And Legally Defective.</u>**

CCI asserts that it is entitled to Summary Judgment based upon an argument that the

Agreement between CCI and IFS is void as a matter of law. While the many factual issues wich preclude granting Summary Judgment on that basis are discussed below, the argument has a fatal procedural flaw which precludes the granting of Summary Judgment before the merits are even considered.

As CCI notes, a contract in violation of the Securities Act is *voidable*. *See* CCI Memorandum, p.10.[6] In this case, *there is no claim for rescission*. Such a claim, in order to be pursued, should be asserted as an affirmative counterclaim – a claim by a party that it is entitled to, and wishes to, void a contract pursuant to the law.

In this case, there is no extant counterclaim. Instead, there is an affirmative defense that the contract is "voidable." That is, the affirmative defense asserts that the agreement is voidable, but there is no claim seeking to void the contract.

Under these circumstances, IFS respectfully submits that CCI's Motion for Summary Judgment is fatally defective in that the claim for rescission has not been set forth in a manner which can, under these circumstances, be pursued through a Motion for Summary Judgment. Since there has been no such affirmative claim for relief, there is no basis to grant Summary Judgment against IFS on the breach of contract claim.[7]

---

[6] While the statute states, as CCI notes, that such a contract is "void," courts have held, as CCI further notes, that such a contract is voidable, not void. *See*, *e.g.*, *Bache Halsey Stuart, Inc. V. Killop*, 509 F.Supp. 256 (E.D. Mich. 1979). As discussed further, *infra*, such rescission is subject to equitable principles which might preclude voiding an otherwise voidable agreement.

[7] In addition, the failure to assert rescission as a counterclaim precludes formal assertion of equitable defenses to such a claim. Under these circumstance, the failure to affirmatively assert the claim for rescission should preclude Summary Judgment. If, in fact, the law were that a contract were "void" under particular circumstances, a defense asserting that the contract was void might be an appropriate vehicle for a Summary Judgment.

**D. Even If IFS Were Required To Be Registered, Fact Issues Preclude Rescission Of The Contract.**

CCI notes, correctly, that a contract made in violation of the provisions of the Securities act is voidable at the instance of an innocent party.

Here, as noted above, there is nothing in the contract which violates the Securities Act, because it relates to a loan and payment of a fee for the successful placement of the loan. The loan, in fact, came to fruition, albeit as part of what CCI and Laurus (or CCI and McGinn, Smith) negotiated to include more than just the loan, and neither the loan itself nor the Agreement are in violation of the Securities Act. [8]

Furthermore, CCI stumbles when it relies on *Regional I* to support its claim that the contract is void on a number of grounds. First, CCI asserts, that, as a matter of fact, CCI falls within the class of persons the Act is intended to protect. In *Regional I*, the Fifth Circuit gave this issue rather short shrift, and its analysis is not terribly helpful in the context of this Motion for Summary Judgment. The *Regional I* Court noted that the class of persons which the statute is designed to protect include investors and the public interest, 678 F.2d at 561, but, in only the vaguest terms, determines that the protection extends beyond that. Without much analysis, the Court held that, in that case, the Plaintiff was within the class of persons which the Act was designed to protect. However, there is nothing

---

[8] In *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189 (3rd Cir. 2001), the Court catalogued numerous cases which distinguish between contracts which specifically require transactions or actions which must be performed by a registered broker and those which do not explicitly include such a requirement, but do have a tangential or collateral aspect that includes some form of security. In noting that the *Regional* Courts did not make such a distinction, the *Colkitt* Court noted that the *Regional* Court's conclusion, based upon the facts of that case, was consistent with the dichotomy. Thus, the *Colkitt* Court appears to have adopted the holding of, *e.g. Drasner v. Thomson McKinnon Securities, Inc.*, 433 F.Supp. 485 (S.D.N.Y. 1977), that the appropriate scope of inquiry is whether the contract at issue, by *its* terms, are 'made in violation of' or 'the performance of which involves the violation of' the statute. *See, Colkitt*, 272, F.3d 189, *citing/quoting Drasner*, 433 F.Supp. At 501-02.