UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

INDEPENDENT FINANCIAL SERVICES, INC., )
Plaintiff, )
v. ) C.A. No. 04-378-L
CCI Group, Inc., )
Defendant. )

INDEPENDENT FINANCIAL SERVICES, INC.'S
SUBSTITUTE STATEMENT OF DISPUTED/UNDISUPTED FACTS[1]

1. IFS' general business is to bring together individuals or entities seeking financing with a financing source. Herriott Depo., CCI Exh. 3, p.13, l.1 - p.14, l.6.

2. The funding which results from IFS bringing together such parties include loans and equity financing. Herriott Depo., CCI Exh. 3, p.14, l.9 - p.15, l.1.

3. IFS was introduced to CCI in connection with what IFS understood to be CCI's needs for a mortgage financing for the purpose of purchasing boutique-style hotels. Herriott Depo, CCI Exh. 3, p.16, l.13-17.

4. As of May 10, 2004, IFS was of the belief that McGinn, Smith was a registered broker-dealer of securities and an investment banking firm. Herriott Depo., Exh. 6, p.36, l.4-5, 17-21.

5. IFS was aware that Mark Casolo was the Chairman of CCI Group and also related to McGinn, Smith. Herriott Depo., Exh. 6, p.37, l.1-4.

---

[1] This Statement is so designated because it contains facts which are inconsistent with CCI's recitation of what it terms "undisputed" facts and, in addition, sets forth facts which relate to other matters and are, at this stage, undisputed. In addition, IFS incorporates in its Statement the Verified Amended Complaint, and Exhibits thereto, which were referenced, as well, by CCI in it Memorandum.

6. In early May, 2004, Mark Casolo advised that he needed "funding" in the approximate amount of $25Million over a period of time. The specific discussion was regarding "mortgage financing." Herriott Depo., CCI Exh. 3, p.43, l.7-21.

7. Mr. Herriott does not recall any discussion of financing through any type of security at this time. Herriott Depo., CCI Exh. 3, p.49, l.20-23.

8. The premise of all discussions between IFS and Mr. Casolo was mortgage financing. Herriott Depo., CCI Exh. 3, p.50, l.13-16.

9. Mr. Casolo's interest, at that time was for funding, and the source was not important to him. Herriott Depo., CCI Exh. 3, p.43, l5 - p.44, l.2.

10. IFS received a Private Placement Memorandum that had been prepared by or on behalf of CCI Group, Inc., together with a letter from Mr. Casolo indicating that "the deal structure can be changed to accommodate any type of security including a mortgage[] backed where the property is the collateral." Herriott Depo., CCI Exh. 3, p.49, l.10-14.

11. IFS reviewed the Private Placement Memorandum for the content as it related to real estate investment and background, and not as something IFS would be involved in as a private placement. Herriott Depo., Exh. 6, p.55, l.19-23.

12. IFS never represented that it had the infrastructure, knowledge, licensing or background or understanding to produce a private placement for CCI. Herriott Depo., CCI Exh. 3, p.17, l.17-21.

13. The terms of IFS' compensation were that it would be paid 4% cash and an additional fee for services in the form of warrants, which Mr. Herriott understood to be a device whereby, if exercised, stock could be purchased at a set price. Herriott Depo., Exh. 6, p.59, l.6–17, and Depo. Exh.F (Exh. 5).

14. Mr. Casolo was seeking equity investment through other investors, and IFS was handling the real estate side. Herriott Depo., CCI Exh. 3, p.50, l.22 - p.51, l.1.

15. Mr. Grin, from Laurus Master Funds had been contacted by both Mr. Casolo and discussed the potential financing with Mr. Wolfe, who was affiliated with IFS (Herriott Depo, CCI Exh. 3, p.16, l.24 - p.18, l.1) and Mr. Grin requested that the matter of fees and representation be resolved in order for Laurus to enter into discussions regarding financing for CCI Group, Inc. Herriott Depo., CCI Exh. 3, p.53, l.1-19.

16. IFS sent a proposed agreement to CCI on June 15, 2004. Herriott Depo., CCI Exh. 3, p.64, l.18-24.

17. While IFS was expecting proposed revisions to its proposed agreement, Mr. Casolo sent, instead, an alternative agreement he wanted IFS to execute. Herriott Depo., Exh.6, p.68, l.6-8.

18. IFS stated, on June 17, 2004, prior to the execution of the ultimate Agreement with IFS that it would not sign the agreement proposed by CCI and told Mr. Casolo at that time that IFS was not a registered broker dealer. Herriott Depo., Exh. 6, p.68, l.8-11. The agreement proposed by CCI was a "broker-dealer type of contract." Herriott Depo., Exh. 6, p.70, l.5-6.

19. IFS never offered to obtain acceptable purchasers of securities offered in an amount up to $25Million. Herriott Depo., CCI Exh. 3, p.76, l.16-23.

20. The IFS Agreement included an additional compensation component which was an equity participation in the event that the lender/financing entity took an equity position in connection with the financing. Herriott Depo., Exh. 6, p.78, l.7-22.

21. Ultimately, an Agreement was entered between IFS and CCI. Verified Complaint, Par. 12 and Exh. A.

22. The Agreement provides that IFS is appointed as agent "to negotiate on behalf of client to obtain commitments for the financing from the institution." Verified Complaint, Exh. A.

23. Thereafter, IFS was involved in transmitting information, communicating loan terms, conveying proposal letters and ultimately involved to the extent necessary with the process up to the term sheet being considered a commitment. Herriott Depo., Exh. 6, p.86, l.16 - p.87, l.6. The information transmitted included a spreadsheet showing cash flow at CCI's existing property and a *pro forma* regarding proposed purchases. Herriott Depo., Exh. 6, p.91, l.3 - 25.

24. The terms which Laurus offered which ultimately became the basis of the commitment were, in essence, a mortgage financing and an equity participation. Herriott Depo., CCI Exh.3, p.89, l.25 - p.90, l.13.

25. The proposal letter from Laurus included a first mortgage on the properties. Herriott Depo, CCI Exh. 3, p.103, l.1-15.

26. After issuance of the commitment, IFS was no longer involved in the negotiation of the specific transaction documents. Herriott Depo., CCI Exh. 3, p.104, l.12-19.

27. IFS did, in fact, negotiate on behalf of CCI to obtain commitments for the financing from Laurus. Herriott Depo., CCI Exh.3, p.105, l.8-16.

28. Mr. Casolo told IFS that the reason IFS was not paid a fee as expected at the closing of the Laurus transaction was because a principal of Laurus refused to make the payment. Herriott Depo., Exh.6, p.129, l.11-13, p.130, l.8-14.

29. Mark Casolo is a Senior Vice President at McGinn Smith and, as well, Chairman of CCI Group, Inc. Casolo Depo., CCI Exh. 2, p.4, l. 8-11, p.6, l.16-17.

30. The Private Placement Memorandum, if successful in raising capital, would not have resulted

in any mortgage interest in any subscriber. Casolo Depo., Exh. 7, p.19, 20-25. According to Mr. Casolo, his initial expectation regarding Laurus as a source for funds was an "asset-based transaction" and not financing as contemplated in the private placement memorandum. Casolo Depo., CCI Exh. 2, p.47, l.16-22.

32. Prior to CCI and IFS being associated in any manner, it was Mr. Casolo's understanding that Laurus was not interested in the Private Placement which was set forth in the Private Placement Memorandum. Casolo Depo., CCI Exh.2, p.51, l.22 - p.52, l.13.

33. As part of the closing with Laurus, in excess of $10Million was placed in a restricted account, and CCI began paying interest on that money. Casolo Depo., Exh.7, p.77, l24 - p.78, l.2; p.78, l.9-14.

34. Mr. Casolo admits that Mr. Herriott, of IFS was performing functions in connection with the financing at least to a limited extent, including making sure a check was transmitted which was required by the commitment. Casolo Depo., Exh.7, p.86, l.4-13. Mr. Casolo states that Mr. Herriott made calls checking to see if CCI had anything else it needed to do. Casolo Depo., CCI Exh.2, p.109, l.24 - p.110, l.5.

35. All of the closing documents were drafted by Laurus and reviewed by CCI's counsel. Casolo Depo., Exh.7, p.88, l.3-9.

36. McGinn, Smith's engagement letter called for it to receive 10% of funds raised. Casolo Depo., Exh.7, p.90, l.21 - p.91, l.1.

37. The anticipated fee to McGinn, Smith to be paid at the closing and as set forth in various documents filed with the Securities and Exchange Commission was 4%. Exh. 4, CCI Production, p.00136.

38. The fee to be paid to IFS was described in the closing documents as a commission on the

funding resulting from the agreement. Casolo Depo., Exh.7, p. 112, l.21 - p.113, l.3.

39. The closing with Laurus resulted in the funding of the amount of $10.5Million. Of that sum, $10.125Million was placed in a so-called "restricted account" held in the name of CCI Group at North Fork Bank. Exh. 1, CCI production, page 00101.

40. The funds held in the restricted account could only be used for purchases of property up to 60% of the value of such property (lesser of appraised of consideration) and only if a mortgage were perfected in favor of Laurus as part of the transaction. Exh. 2, CCI production, p.00111-112.

41. As part of the Laurus closing, Laurus was granted a security interest in all assets of CCI. Exh. 8, CCI production, p.00168.

Respectfully submitted,
Independent Financial Services, Inc.,
by its attorney,

Date: 7/11/05

Jeffrey S. Michaelson (#3299)
Michaelson & Michaelson
P.O. Box 622
7454 Post Road
North Kingstown, R.I. 02852
(401)295-4330
(Fax)295-5220

**CERTIFICATE OF SERVICE**

I hereby certify that a true and accurate copy of the foregoing document was mailed, by regular mail, postage prepaid, on this 11 day of July, 2005, to the following attorney(s) of record:

Mark W. Freel
Edwards & Angell, LLP
2800 Financial Plaza
Providence, R.I. 02903