①

**CCI Group, Inc.**
**405 Park Avenue, 10th Floor**
**New York, NY 10022**

Joint Instructions

July 29, 2004

Scott Giordano, Esq.
Loeb & Loeb LLP
345 Park Avenue
New York, New York 10154

RE: CCI Group, Inc. (the "Company") – Escrow Release
Gross Escrow Deposit: $10,500,000.00

Dear Mr. Giordano:

These instructions are given to you pursuant to a Funds Escrow Agreement among the Company, Laurus Master Fund, Ltd., and Loeb & Loeb LLP as Escrow Agent. Subject to the terms set forth below, you are instructed to disburse $10,500,000.00 of the investor's funds received by you to and on the Company's behalf as follows:

1. $10,105,500.00 to CCI Group, Inc. Restricted Cash Account pursuant to the following wire instructions:

| | |
|---|---|
| Bank: | North Fork Bank<br>New York, NY 10022 |
| ABA Number: | [redacted]12 |
| For Credit to: | CCI Group, Inc. |
| Account Number: | [redacted]030 |

2. $367,500.00 to Laurus Capital Management, L.L.C. (for management fees), pursuant to the following wire instructions:

| | |
|---|---|
| Bank: | North Fork Bank<br>New York, NY 10022 |
| ABA Number: | [redacted]912 |
| For Credit to: | Laurus Capital Management, LL.C. |
| Account Number: | [redacted]278 |

3. $24,500.00 to Laurus Capital Management, L.L.C. (for payment in full of all due diligence and documentation fees owing by the Company) pursuant to the following wire instructions:

| | |
|---|---|
| Bank: | North Fork Bank<br>New York, NY 10022 |
| ABA Number: | [redacted]912 |
| For Credit to: | Laurus Capital Management, LL.C. |
| Account Number: | [redacted]278 |

4. $2,500.00 to Loeb & Loeb LLP (for escrow agent fee) pursuant to the following wire instructions:

| | |
|---|---|
| Bank: | Citibank, N.A. |
| ABA No: | [redacted]089 |
| Acct. No.: | [redacted]308 |
| Reference: | Laurus Escrow Arrangement |

Very truly yours,

CCI GROUP, INC.

By: ______________________

Mark Casolo
Chairman

Accepted and Agreed:

Laurus Master Fund, Ltd.

By: ______________________

LAURUS MASTER FUND, LTD.
825 Third Avenue, 14th Floor
New York, New York 10022

(2)

July 29, 2004

CCI Group, Inc.
405 Park Avenue
New York, NY 10022
Attn: Mark Casolo

Re: Restricted Account: Account Number 2704052030,
Account Name: CCI Group, Inc., maintained at North Fork Bank (the "Restricted Account").

Reference is made to (i) that certain Securities Purchase Agreement, dated as of July 29, 2004 (as amended, modified or supplemented from time to time, the "Purchase Agreement"), by and between CCI Group, Inc., a Utah corporation (the "Company"), and Laurus Master Fund, Ltd. (the "Purchaser") and (ii) that certain Restricted Account Agreement, dated as of July 29, 2004 (as amended, modified or supplemented from time to time, the "Restricted Account Agreement"), by and among the Company, Laurus and North Fork Bank (the "Bank"). Capitalized terms used but not defined herein shall have the meanings ascribed them in the Purchase Agreement or the Restricted Account Agreement, as applicable. Pursuant to the Section 3.2 of the Purchase Agreement, the Company is required to place $10,105,500 in the Restricted Account, and, subject to the provisions of this letter, the Purchase Agreement and any Related Agreement, maintain such amount in the Restricted Account for as long as the Purchaser shall have any obligations outstanding under the Note and to assign the Restricted Account for the benefit of the Purchaser as security for the performance of the Company's obligations to the Purchaser.

The Purchaser and the Company desire to clarify certain aspects regarding the use of funds contained in the Restricted Account, and for good consideration, the receipt and sufficiency of which is here acknowledged, the Company and the Purchaser agree that, in connection with the consummation of a Property Acquisition (and as partial cash in consideration therefor), the Purchaser shall direct the Bank, pursuant to a Release Notice (as defined in the Restricted Account Agreement), to wire from the Restricted Account to such bank account as the Company may direct the Purchaser in writing, an amount of funds equal to the lesser of (x) 60% of the Appraised Value (as defined below) of the property acquired in connection with such Property Acquisition (each, an "Acquired Property") and (y) 60% of the total cash consideration paid to the seller in connection with such Property Acquisition (each such release referred to in this sentence, a ("Property Acquisition Release"); provided that a Property Acquisition Release shall only be consummated if (i) no Event of Default then exists or would result therefrom, (ii) the Purchaser has approved the such Property Acquisition following its evaluation of all factors that it considers (in its sole discretion) relevant at the time of such requested Property Acquisition Release, including its determination (I) of the relative benefit of such Property Acquistion to the Company and its Subsidiaries and (II) of the overall performance (financial or otherwise) of the Company and its Subsidiaries at such time, (iii) the Company and its Subsidiaries have complied with Section 6.12(f)

of the Purchase Agreement with respect to such Property Acquisition, (iv) the Purchaser shall have received, from an independent appraiser satisfactory to the Purchaser, an appraisal of the Acquired Property setting forth the fair market value of the Acquired Property (such value, the "Appraised Value"), (v) the Company and/or the relevant Subsidiary thereof shall have (x) executed such mortgages and other security documentation (in each case in form and substance satisfactory to the Purchaser) necessary or desirable in the opinion of the Purchaser to grant to the Purchaser a first priority perfected security interest (or the equivalent thereof) in the Acquired Property and (y) delivered to the Purchaser title insurance, surveys, legal opinions, and/or such other documentation or certificates requested by the Purchaser in connection with the foregoing, (vi) the Company shall have provided evidence to the Purchaser that it is in compliance with Section 6.08 of the Purchase Agreement with respect to the Acquired Property and (vii) the Company shall have paid to the Purchaser all expenses (including the fees and expenses of counsel to the Purchaser) incurred by the Purchaser in connection with the foregoing. Furthermore, for good consideration, the receipt and sufficiency of which is here acknowledged, the Company and the Purchaser agree that, so long as the Amortizing Principal Amount (as defined in the Note) at such time has been reduced (through conversions or otherwise) to $0, promptly following any conversion of a Monthly Principal Amount (as defined in the Note) or such other Principal Amounts into Common Stock of the Company (such event, a "Conversion"), the Purchaser shall direct the Bank, pursuant to a Release Notice (as defined in the Restricted Account Agreement), to wire an amount of funds equal to the corresponding dollar amount by which the aggregate Principal Amount of the Note has been reduced pursuant to such a Conversion from the Restricted Account to such bank account as the Company may direct the Purchaser in writing.

This letter may not be amended or waived except by an instrument in writing signed by the Company and the Purchaser. This letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this letter by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof or thereof, as the case may be. This letter shall be governed by, and construed in accordance with, the laws of the State of New York. This letter sets forth the entire agreement between the parties hereto as to the matters set forth herein and supersede all prior communications, written or oral, with respect to the matters herein.

If the foregoing meets with your approval please signify your acceptance of the terms hereof by signing below.

Signed,

**Laurus Master Fund, Ltd.**

By:____________________
Name:
Title:

Agreed and Accepted this 29th day of July, 2004.

**CCI Group, Inc.**

By:____________________
Name:
Title:

U.S. Securities and Exchange Commission

3

# Guide to Broker-Dealer Registration

**Division of Market Regulation**
**U.S. Securities and Exchange Commission**
**August 2004**

## TABLE OF CONTENTS


I. Introduction
II. Who is Required to Register
  A. Who is a "Broker"
  B. Who is a "Dealer"
  C. What To Do If You Think You May be a Broker or a Dealer
  D. Brokers and Dealers Generally Must Register with the Commission
    1. "Associated Persons" of a Broker-Dealer
    2. Intrastate Broker-Dealers
    3. Broker-Dealers that Limit their Business to Excluded and Exempted Securities
    4. Broker-Dealers Must Register Before Selling Unregistered Securities — Including Private Placements (or Regulation D offerings)
    5. Issuer's Exemption
    6. Foreign Broker-Dealer Exemption
  E. Requirements Regarding Brokers and Dealers of Government and Municipal Securities, and Dealers in Repurchase Agreements
  F. Special Rules That Apply to Banks and Other Financial Institutions
  G. Insurance Agency Networking
  H. Real Estate Broker Networking
  I. Broker-Dealer Relationships with Affinity Groups
III. How to Register as a Broker-Dealer
  A. Form BD
  B. SRO Membership
  C. SIPC Membership
  D. State Requirements
  E. Associated Persons
  F. Successor Broker-Dealer Registration
  G. Withdrawal from Registration
IV. Security Futures
V. Conduct Regulation of Broker-Dealers
  A. Antifraud Provisions
    1. Duty of Fair Dealing
    2. Duty of Best Execution
    3. Customer Confirmation Rule
    4. Disclosure of Credit Terms
    5. Restrictions on Short Sales
    6. Trading During an Offering (Regulation M)
    7. Restrictions on Insider Trading
    8. Restrictions on Private Securities Transactions
  B. Analysts and Regulation AC
  C. Trading by Members of Exchanges, Brokers and Dealers
  D. Extending Credit on New Issues
  E. Order Execution Obligations
  F. Penny Stock Rules

Most "brokers" and "dealers" must register with the SEC and join a '
organization," or SRO. This section covers the factors that determin
person is a broker or dealer. It also describes the types of brokers a
do not have to register with the SEC. Self-regulatory organizations a
Part III, below./P>

**A note about banks**: The Exchange Act also contains special provis
brokerage and dealing activities of banks. Please see Sections 3(a)(4
(5)(C) and related provisions, and consult with counsel. Aspects of bank dealer activity are discussed in a publication issued by the SEC's Division of Market Regulation, entitled "Staff Compliance Guide to Banks on Dealer Statutory Exceptions and Rules," which is available on the SEC's website at: http://www.sec.gov/divisions/marketreg/bankdealerguide.htm. Bank brokerage activity will be discussed in a separate publication. Also see Section II.F, below.

### A. Who is a "Broker"

Section 3(a)(4)(A) of the Act generally defines a "broker" broadly as

> any person engaged in the business of effecting transactions in securities for the account of others.

Sometimes you can easily determine if someone is a broker. For instance, a person who executes transactions for others on a securities exchange clearly is a broker. However, other situations are less clear. For example, each of the following individuals and businesses may need to register as a broker, depending on a number of factors:

- "finders," "business brokers," and other individuals or entities that engage in the following activities:
    - Finding investors or customers for, making referrals to, or splitting commissions with registered broker-dealers, investment companies (or mutual funds, including hedge funds) or other securities intermediaries;
    - Finding investors for "issuers" (entities issuing securities), even in a "consultant" capacity;
    - Engaging in, or finding investors for, venture capital or "angel" financings, including private placements;
    - Finding buyers and sellers of businesses (i.e., activities relating to mergers and acquisitions where securities are involved).
- investment advisers and financial consultants;
- foreign broker-dealers that cannot rely on Rule 15a-6 under the Act (discussed below);
- persons that operate or control electronic or other platforms to trade securities;
- persons that market real-estate investment interests, such as limited partnership interests, that are securities;
- persons that act as "placement agents" for private placements of securities;
- persons that market or effect transactions in insurance products that are securities, such as variable annuities, or other investment products that are

securities;

- persons that effect securities transactions for the account of others for a fee, even when those other people are friends or family members;
- persons that provide support services to registered broker-dealers; and
- persons that act as "independent contractors," but are not "associated persons" of a broker-dealer (for information on "associated persons," see below).

In order to determine whether any of these individuals (or any other person or business) is a broker, we look at the activities that the person or business actually performs. You can find analyses of various activities in the decisions of federal courts and our own no-action and interpretive letters. Here are some of the questions that you should ask to determine whether you are acting as a broker:

- Do you participate in important parts of a securities transaction, including solicitation, negotiation, or execution of the transaction?
- Does your compensation for participation in the transaction depend upon, or is it related to, the outcome or size of the transaction or deal? Do you receive trailing commissions, such as 12b-1 fees? Do you receive any other transaction-related compensation?
- Are you otherwise engaged in the business of effecting or facilitating securities transactions?
- Do you handle the securities or funds of others in connection with securities transactions?

A "yes" answer to any of these questions indicates that you may need to register as a broker.

### B. Who is a "Dealer"

Unlike a broker, who acts as agent, a dealer acts as principal. Section 3(a)(5)(A) of the Act generally defines a "dealer" as:

> any person engaged in the business of buying and selling securities for his own account, through a broker or otherwise.

The definition of "dealer" does not include a "trader," that is, a person who buys and sells securities for his or her own account, either individually or in a fiduciary capacity, but not as part of a regular business. Individuals who buy and sell securities for themselves generally are considered traders and not dealers.

Sometimes you can easily tell if someone is a dealer. For example, a firm that advertises publicly that it makes a market in securities is obviously a dealer. Other situations can be less clear. For instance, each of the following individuals and businesses may need to register as a dealer, depending on a number of factors:

- a person who holds himself out as being willing to buy and sell a particular security on a continuous basis;
- a person who runs a matched book of repurchase agreements; or
- a person who issues or originates securities that he also buys and sells.

(4)

**SCHEDULE 4.5**

1. As disclosed in the Company's Exchange Act Filings, the Company has issued its 12% subordinated notes to Atlantis Investors Income Notes LLC and Atlantis Strategic Total Return Fund, LLC. In addition to amounts disclosed in the Company's Exchange Act Filings, from April 1, 2004 to the date hereof, the Company issued an additional $1,320,950 in subordinated notes to the two funds. Both funds are controlled by the Chairman of the Company. In addition, from April 1, 2004 through the date hereof, the Company borrowed the sum of $500,000 from a third party. The debt is due and payable on demand. The Company will replace this debt with a convertible preferred stock issuable to a fund controlled by the Chairman of the Company within 120 days from the date hereof.

2. On May 1, 2004, McGinn Smith entered into an agreement with the Company in connection with certain financial consulting to be provided to the Company. Under the Agreement, the Company is obligated to pay McGinn Smith 10% of the gross proceeds raised (except that if funds used to acquire all or part of any resort by the Company or its Subsidiaries are from Laurus Master Fund, the fee payable on all funds used to acquire the resort will be 4%), and 5% of the purchase price of any properties acquired by the Company which were introduced by McGinn Smith.

3. The Company is obligated to pay McGinn Smith and Independent Financial Services, each a 4% commission on the funding resulting from this Agreement.

4. The Company is obligated to pay McGinn Smith the sum of $250,000 in connection with the acquisition of the resort in Barbuda.

**Main Identity**

(5)

**From:** "Hal M. Wolfe" <hwolfe2@earthlink.net>
**To:** "Dick Herriott" <dherriott@ifs-usa.com>
**Cc:** "Matthew Herriott" <mherriott@ifs-usa.com>
**Sent:** Monday, June 14, 2004 10:10 PM
**Subject:** FW:

Dick let us chat before we release the CCGI letter you faxed to me.

Hal M.Wolfe
Blue Light Capital Partners, LLC
363 Darling Road, Salem, CT 06420
860-887-9100 office
860-889-0569 fax
860-639-9449 cell
hwolfe2@earthlink.net

-----Original Message-----
**From:** Mark Casolo [mailto:casolom@mcginnsmith.com]
**Sent:** Monday, June 14, 2004 9:49 AM
**To:** 'Hal M. Wolfe'
**Cc:** 'Eugene Grin'
**Subject:**

Dear Hal:
Please use this email as confirmation of our ability to continue to work together on the capital raising requirements of CCI Group, Inc. I agree in principal with the terms we discussed of four percent (4%) cash compensation and an additional amount of compensation in warrants (the exact amount to be discussed). Please forward to me a copy of your engagement agreement reflecting this.
Regards,
Mark

PS; Marcello Pigozzo (our president and ceo) when he was CEO for Credit Suisse First Boston and repositioning their hotel division for sale created a "high end" boutique hotel called "The House", in my conversation with Eugene he indicated he has stayed there, so he is somewhat familiar with the product we are delivering because that is exactly what we are trying to replicate at each of our resort locations. I will forward to you a copy of the information I have sent to Eugene.

EXHIBIT
F
3-29-05

Page 130

Q. To find out why you did not get the wire transfer?
A. Yes.
Q. And he described to you what you just said to me?
A. And in all probability, I called Pat Regan.
Q. It was Mr. Grin who determined at the closing that IFS would not be paid a fee?
MR. MICHAELSON: Objection.
A. Yes. He told us that.
Q. And actually ripped up something that would have otherwise led to your receiving a fee?
A. According to Mr. Casolo.
Q. According to Mr. Casolo. Did you at any time after learning that contact Mr. Grin to talk to him about that?
A. Yes, I did.
Q. What happened?
A. We had a number of conversations and he said that Mark Casolo was an honorable man and he would pay us. He would not come out with any more front end dollars on the transaction until the closing of the loan took place. Although he did take his fee

Page 131

and his legal fees. And his fee was $350,000. It would appear that Mr. Eugene Grin basically established ground rules, because he was the lender and he had the money. So took his fees and his legal fees. Mark Casolo said the four points he was supposed to get, which we were not aware of until the closing because we didn't think McGinn Smith was part of the fee structure. And Eugene Grin balked at putting $800,000 out at that time of Laurus money.
Q. When you talked to Mr. Grin, did he acknowledge to you that the decision not to include fees for IFS was a decision he made at the closing?
MR. MICHAELSON: Objection.
A. I at this time heard what Eugene Grin said. My client was CCI and in truth, they owed me the money and that is what Eugene Grin told me. He said, I don't owe you the money. It was not my responsibility to pay you at the closing, it was your client's responsibility. No matter who made the decision, at that time he said it was CCI

Page 132

who owed us the money.
Q. In the complaint in this case, there is an allegation made on behalf of IFS that it was IFS's belief that the amount of funds to be made available at the closing was going to be grossed up to include the amount of the fee to be paid to IFS; are you familiar with that?
A. Yes, I am.
Q. Did somebody tell you prior to the closing that the amount to be funded at the closing was being grossed up to include an amount equal to IFS's fee?
A. Eugene Grin told us that at the meeting when the term sheet was signed by Mark Casolo on June 24 or thereabouts.
Q. Did anyone other than Mr. Grin tell you that?
A. No. Eugene Grin was the partner handling that transaction.
Q. So he told you that?
A. Yes.
Q. Leading you to believe that as of that time your $400,000 didn't have to come out of CCI's $10 million but would be added on to

Page 133

the principal amount being financed?
A. Yes.
Q. Were any of the documents you saw, any of the proposals or term sheets, did they call for $10,400,000 to be funded or made available?
A. I believe the document was for $10,500,000.
Q. Let's look at Exhibit P and see if your memory is right. This calls for an investment amount of $10 million; is that correct?
A. Yes.
Q. Does that refer to any additional funds being made available for your fee or anybody else's fee?
A. It says at close the investor will fund $10 million net of closing fees. That is what it says.
Q. You understood IFS's fee to be included in that?
A. Yes.
Q. You were aware from a pretty early juncture that Mr. Casolo was also affiliated with an entity called McGinn Smith?

Page 34

than what Mr. Wolfe gave you?
MR. MICHAELSON: Objection.
A. I would have no reason to do that at that point.
Q. And to your knowledge, nobody in your company did do that?
A. To my knowledge.
Q. Did CCI Group and IFS enter into a nondisclosure agreement?
A. Yes.
Q. Do you know if that happened prior to the conference call on May 12?
A. I would have to let the record speak for that. I know one was signed, but I don't know the date.
Q. Do you still have a copy of that nondisclosure agreement?
A. I believe I gave it to my counsel.
Q. I am not sure if I have it.
A. 5-11, received executed NDA from Mark Casolo. It is on 5-11.
Q. You believe you gave a copy of that to Mr. Michaelson, at least that is your memory?
A. Yes.

Page 35

Q. We may need to double-check on that because I don't believe I have it. We can revisit that as necessary. If you go back down on the second page of Exhibit C, the one that is Marked Page 6, in the entry for May 10, 2004 at 3:22 p.m., there is an entry indicating McGinn Smith & Company, Inc. is a full service investment banking company; do you see that?
A. Yes.
Q. Do you know what led Mrs. Herriott to make that entry identifying that entity, McGinn Smith, on that date at that time?
A. Probably information supplied by Hal Wolfe or information she received.
Q. Did you or IFS have information as of May 10, 2004 indicating there was some affiliation or relationship between CCI Group and McGinn Smith or some of its principals?
A. We were told by Hal Wolfe, and whether it came from Mark Lev or not, I am not sure, but we were told Mark Casolo had an affiliation with McGinn Smith, so we knew McGinn Smith was involved in the

Page 36

transaction.
Q. And you understood McGinn Smith was a full transaction banking company?
A. They told us they were broker dealers and an investment banking company, so how full service is put in there, I couldn't give you every service they provide.
Q. The reason you sort of -- strike that. I used the words full service because I got them out of the document. What you are saying is you don't know why Mrs. Herriott put the words full service in there when she made this entry on May 10; is that what you are saying?
A. I don't know what source she used. She used the words full service.
Q. But you, it is clear as of May 10, 2004, IFS was aware that McGinn Smith was a registered broker-dealer of securities, correct?
A. Yes.
Q. As of May 10, IFS was aware that McGinn Smith was an investment banking company as well; is that correct?
A. Yes.

Page 37

Q. And IFS was aware that Mark Casolo, who was also the chairman of CCI Group, had some relationship with McGinn Smith?
A. Yes.
Q. The NDA that IFS sent to Mark Casolo, was that an NDA between CCI Group and IFS?
A. Yes.
Q. Were Hal Wolfe or Blue Light Capital Partners a party to the NDA?
A. Not to my knowledge. One is to protect confidentiality of any transaction we have with the lender. It was also a noncircumvent agreement so that the individual could not circumvent us with a lender. That is the purpose of our NDA.
Q. It is more than just a nondisclosure agreement?
A. It has language that goes beyond just standard NDA language.
Q. You mentioned a Mark Lev a couple of times, who is Mr. Lev?
A. Mark Lev basically is an attorney who is a principal in a company called Well Fleet Parkers.
Q. Earlier when I asked you did Mr. Wolfe ever

have such a fee agreement in place with a client or customer like CCI even if somebody else had not suggested that?

MR. MICHAELSON: Objection.

A. Yes. We always have an agreement, authorization terms agreement, before we move forward.

Q. Is that always in writing?

A. In writing, yes.

Q. In this case, although somebody from Laurus Master Funds suggested that, that was something you would have done anyway?

A. I would have done it if Laurus required it. We could not present it until we had it agreed to because Laurus required it.

Q. When Mr. Casolo sent you the overnight letter dated May 12, 2004 we marked as Exhibit D, one of the attachments to that was a private placement memorandum; is that correct?

A. Yes.

Q. Do you recall that document accompanying that letter?

A. I don't recall that. In fact, I really never reviewed it because it was not



something I would be involved in.

MR. FREEL: Mark this as Exhibit E.

(EXHIBIT E MARKED FOR IDENTIFICATION)

Q. Exhibit E is a multi-page document that is, in fact, the private placement memorandum referenced in Mr. Casolo's letter to you of May 12; is that correct?

MR. MICHAELSON: Objection.

A. Yes.

Q. You do recall receiving this document; is that correct?

A. Yes.

Q. But I take it your testimony is you never really reviewed it or paid a lot of attention to it because it wasn't something you were familiar with; is that correct?

MR. MICHAELSON: Objection.

A. I looked at the document for the content as it related to real estate investment and background, not as a private placement memorandum that we would be involved in.

Q. Do you have an understanding of what a private placement memorandum is?



A. I have a general understanding, but as far as the specifics and legality and rules and regulations under a broker-dealer, I really do not understand it totally and completely.

Q. Would you agree with me this private placement memorandum indicates CCI Group is indicating to offer certain notes as a vehicle for raising up to $25 million?

A. That is what it states in the first line of this particular document, yes.

Q. But your understanding as of May 12 or 13 of 2004 is that if CCI sought financing through that particular structure, that was something it was pursuing through others and IFS was not involved in that?

A. IFS does not have the infrastructure, knowledge, licensing or background or understanding to go out and produce a private placement for CCI and we never represented such to CCI.

Q. It is your testimony that to the extent IFS would provide services to CCI, it was going to be find CCI other alternatives such as real estate mortgage financing?



A. That was our understanding with CCIG, yes.

MR. FREEL: Mark this as Exhibit F.

(EXHIBIT F MARKED FOR IDENTIFICATION)

Q. Who is Eugene Grin?

A. A principal of Laurus.

Q. Before I show you this next document, I want to ask you one question. In this approximately 30-day or one-month period between mid May when this first came up and the time in mid June when you were negotiating the terms of the letter agreement between IFS and CCI, was Mr. Casolo in contact, to your knowledge, with Mr. Wolfe individually or you individually or was he always dealing with both of you? Do you know how that worked?

A. Mr. Casolo dealt with both of us. If he had questions, he could call Hal or me or call us together. He had flexibility on how he could deal with us.

Q. Do you know if at any time prior to mid June whether you or Mr. Wolfe described to Mr. Casolo what the nature of your

affiliation or collaboration with one
another was?
A. I don't know that we specifically
indicated what our relationship was. I
don't recall that.
Q. The letter he sent on May 12 is addressed
to Mr. Wolfe at Independent Financial
Services; is that correct?
A. Yes, it is.
Q. Did either of you ever represent to
Mr. Casolo at any time that Mr. Wolfe had
some affiliation with Independent Financial
Services?
A. I believe we indicated he was
affiliated but that was the extent of it.
He is affiliated with us in business
transactions.
Q. You may have indicated he was affiliated
with IFS but not how?
A. Mr. Wolfe may have indicated that, but
I don't believe we discussed what the
arrangements were or anything of that
nature.
Q. Exhibit F is a document with a couple of
E-mails on it. Let's read from the bottom



up. At the bottom is an E-mail from Mark
Casolo to Hal Wolfe on Monday May 14, 2004
at 9:49 a.m. with a cc to Eugene Grin; do
you see that?
A. Yes, I do.
Q. It indicates that this E-mail would be
confirmation of the ability of the parties
to continue to work together on capital
raising requirements of CCI Group?
A. Yes.
Q. The terms we discussed of 4 percent cash
compensation and an additional amount of
compensation in warrants, the exact amounts
to be discussed. Do you know when prior to
this E-mail Mr. Casolo and Mr. Wolfe
discussed those compensation terms?
A. I don't know the exact date.
Q. Do you know if it was on the conference
call on May 12 or sometime in between?
A. I believe it was sometime in between.
I don't recall the exact date.
Q. Do you know if you were personally involved
at that time?
A. I don't believe I was, no.
Q. As of this date, June 14, 2004, had IFS



ever before been compensated in warrants
for any of the services it provided to
anybody else?
A. No.
Q. Do you know what warrants are?
A. I do today.
Q. Did you know then?
A. I had a general idea, yes.
Q. Did you have a general idea then warrants
were some kind of an interest in
securities?
MR. MICHAELSON: Objection.
A. My understanding was it gave us the
right to buy securities as a price. So an
interest meaning you would have to purchase
it.
Q. Given that as of this date you had never
been compensated in that form before, did
you have any questions or concerns about
what you would be getting?
A. No.
Q. Did you discuss that with Mr. Wolfe at all?
A. Yes.
Q. What did he tell you?
A. It is just an additional fee as lenders



today take fees along with interest. They
take equity interest. We would be
effectively in a position where we would be
getting additional income for our services.
Initially our fee on this was 8 percent and
as this was being discussed with Mr. Wolfe
and Mr. Casolo, Mr. Casolo indicated that
his firm, I am not sure he states it at
that point. In fact, I think we were
surprised by that. He said 4 percent was
all he would pay us. And at the closing we
found the firm would get 4 percent and that
is why he negotiated our 8 percent down to
4 percent. We didn't know that until the
documents came back from the closing.
Q. This E-mail on June 14 from Mark Casolo to
Hal Wolfe indicates that Mark Casolo had
spoken to Eugene Grin at Laurus sometime
prior to that E-mail; is that correct?
A. Yes.
Q. And do you know how Mr. Casolo came to be
in contact with Eugene Grin at Laurus on
any occasion prior to June 14, 2004?
A. I don't.
Q. Do you know if prior to May or June of 2004

that is an E-mail from Mr. Wolfe to Mr. Casolo on Monday, June 14 at 10:10 p.m.; is that correct?
A. Yes.
Q. Saying to him, good morning, assuming Mr. Casolo would read it the following morning. I received your voice message and will give you a call. I will have our engagement agreement out to you shortly. I will give you a call to coordinate the discussions you had with Eugene and the model I asked for. First of all, that appears to reference conversations Mr. Casolo had at that time with Eugene Grin of Laurus; is that correct?
A. Yes.
Q. Do you know what is being referred to there when it discusses the model that Mr. Wolfe asked for; do you know what that refers to?
A. I don't.
Q. You don't know what the word model means in this context?
MR. MICHAELSON: Objection.
A. I don't.
Q. Then it says the three properties cost what



to acquire 100 percent; do you know what he is asking for there, what Mr. Wolfe is asking Mr. Casolo for?
MR. MICHAELSON: Objection.
A. I understand what property cost, it says the three properties cost what to acquire 100 percent. I don't know what context he is asking the question.
Q. That is fine. At the top of this page, Mr. Wolfe forwarded this E-mail to you on August 9, 2004, for your file. Do you recall why he forwarded that E-mail to you a couple of months later?
A. I have no idea. Maybe it was just to complete the file.
Q. If I could ask you to turn to the fourth page of Exhibit C, which is the one marked Page 4 in the lower right-hand corner, again start from the bottom up, the very bottom entry on June 16, 2004 indicates that at 1:37 p.m. you, Mr. Wolfe and Mr. Casolo were on a conference call to go over some changes Mr. Casolo was suggesting or making in the agreement between CCI and IFS, correct?



A. Yes.
Q. Reading up the page, later that day, it looks like you received some of Mr. Casolo's changes in an E-mail; is that correct?
A. Yes. In fact, on the 17th I received from Mark not a revision, but it was a CCI Group agreement he wanted us to execute. I told him that I was not a broker-dealer and I could not execute that document, that he would have to execute our document. And it was at that point that he was shocked we were not a broker-dealer. We would not sign his agreement because it was a broker-dealer agreement.
Q. First of all, go back down the page to the entry June 16, 2004 at 2:16 p.m.; do you see that?
A. Yes.
Q. We are waiting for E-mail changes proposal per Hal Wolfe from Mark Casolo Group. What do you recall about that entry?
A. That Mark did not want to sign our agreement but wanted to sign a revised agreement. That is what I recall about



that entry.
Q. When it says E-mail changes, you take that to mean a whole new proposal agreement?
A. No. I took that basically as he was looking to change our document. That is what I took that comment at that time for.
MR. FREEL: Mark this as Exhibit H.
(EXHIBIT H MARKED FOR IDENTIFICATION)
Q. Exhibit H is an E-mail from you to Mr. Casolo on June 16, 2004 at 11:02 a.m., attaching the IFS authorization terms agreement for the purposes of his proposed changes and forwarding him a proposed agreement dated June 15, 2004, correct?
A. Correct.
Q. You were anticipating, even at the time you sent this, that he might have some proposed changes, correct? I am referring to your cover E-mail.
A. Yes.
Q. Do you recall that he got back to you with some changes to this or that he only forwarded you his own proposal or did both of those things happen in some sequence?

A. He forwarded us his proposal. He said it would be easier if we used his document, which is used in the industry. I just waited for the proposal to be sent to me. He sent me a broker-dealer type of contract. I told him we are not broker dealers and I couldn't execute it and we would have to go with our original transaction to be modified, if that is what he wanted to do.
MR. FREEL: Mark this as Exhibit I.
(EXHIBIT I MARKED FOR IDENTIFICATION)
Q. Mr. Herriott, Exhibit I is an E-mail. The bottom E-mail on that page is from Mark Casolo to you on June 17 at 10:23 a.m., saying, Richard, rather than make wholesale changes to your agreement, I used a scaled-down version of my agreement, believing this covers most points. Let me know your thoughts after you review it. This is what you are referring to when you say he offered up his own agreement?
A. Yes, it is.
Q. Do you know if sometime in between you



sending Mr. Casolo your proposed agreement on June 16 at 11 in the morning and him sending this back to you approximately 24 hours later if you discussed with him what wholesale changes he wanted to make to your agreement?
MR. MICHAELSON: Objection.
A. In fact, he wasn't talking about a wholesale change. He was talking about a totally different agreement.
Q. I understand that, but the question I am asking you is, before he proposed an entirely different agreement, did he discuss with you any questions, comments or concerns he might have or proposed changes he might want to make to your agreement?
A. He had a couple of changes having to do with the terms of the agreement and how long it would stay in effect for. They were not major changes. This was a major change.
Q. When he says to you in his cover E-mail, rather than make wholesale changes to your agreement, do you know what he was referring to there?



MR. MICHAELSON: Objection.
A. I don't.
Q. In the 24-hour period leading up to that, did you and he ever discuss any changes to your proposed agreement that were sort of more than minor?
MR. MICHAELSON: Sorry to do this again. I want to make sure we are on the same page. If I am getting this correctly, 6-16 at 11:25 in the morning is when Dick's terms went to Casolo. It says he got the new agreement at 4:46 on the same day.
MR. FREEL: I am looking at the dates of E-mails the witness has in front of him. I am looking at Exhibits H and I.
THE WITNESS: There is the 16th and 17th.
MR. MICHAELSON: I understand now.
Q. Let's stop for a minute. Keep Exhibits H and I in front of you?
A. Yes.
Q. Since Mr. Michaelson raised a question,



let's make sure we are on the same page. I'm looking at the first page of the E-mails. First of all, can we agree that based upon the front page of Exhibit H that you sent a proposed agreement to Mr. Casolo on Wednesday, June 16 at approximately 11:02 a.m.?
A. Yes.
Q. And going to Exhibit I, can we agree that going to the bottom E-mail on that page that it looks like Mr. Casolo sent you a scaled down version of his agreement on June 17 at 10:23 a.m.?
A. Yes.
Q. The only question I am asking you now is in that interim time frame between you sending him yours and him sending you his, do you recall anything you and he discussed about changes he may want to make in yours if you used yours?
A. I think it is clear if you compare the signed authorization terms agreement and the authorization terms agreement dated June 15 that was transmitted on June 16, you will see the changes are minor.

Page 78

Q. At the top of Page 2 it refers to equity participation; is that correct?
A. Yes.
Q. Did you draft that part?
A. Yes.
Q. What exactly did that refer to?
A. Basically, as a finder, in the event there would be an equity position by anyone, we would get a percentage of that equity position if they took an equity position. We didn't know what the structure of a Laurus equity would be. There was nothing other than we would get a percentage of what the position of Laurus equity would be.
Q. The clause or item here at the top of Page 2, entitled equity participation, you are telling me that refers to IFS's equity participation?
A. Yes, as additional revenue on finalizing a transaction. It is like a fee.
MR. FREEL: Off the record.
(OFF THE RECORD)
MR. FREEL: Back on the

Page 79

record.
Q. If I could ask you on the document in front of you on the page that says Page 4 at the bottom, which is actually the fourth page of the document, to look at the entry 6-17-04, 3:08 p.m.; do you see that?
A. Yes.
Q. Dick received a facsimile from Mark Casolo with the authorization terms agreement. Seems to be with change. Dick to call Mark this afternoon to discuss the agreement, correct?
A. Yes.
Q. Sometime mid afternoon on June 17 you got from Mr. Casolo your form of authorization terms agreement but with some changes made; is that a fair reading of that?
A. It appears to be fair.
Q. In other words, it is not referring to Mr. Casolo sending you his proposed agreement, correct?
A. Correct.
MR. FREEL: Mark this Exhibit J.
(EXHIBIT J MARKED FOR IDENTIFICATION)

Page 80

Q. Exhibit J appears to be an E-mail, part of it, from Mr. Casolo to you on June 17, 2004 at 2:46 p.m. with an attachment entitled CCI Group authorization terms agreement, correct?
A. Yes.
Q. This is a small point, but I want to see if I am clear. The entry made by Mrs. Herriott on the contact report on June 17 at 3:08 p.m. indicates you got a facsimile from Mark Casolo. This is an E-mail of 20 minutes before. Do you know if it is referring to the same document?
A. It is probably an executed, does she say executed. 6-17, counter executed authorization term sent back for his initials. It would appear to me she received a fax that was an executed authorization. This might have preceded it in E-mail format.
Q. I think you are ahead of me. Let me go back with you. Read the 3:08 p.m. entry?
A. I am reading it.
Q. Dick received facsimile from Mark Casolo with the authorization terms agreement.

Page 81

Seems to be with changes. Dick to call Mark this afternoon to discuss, right?
A. Yes.
Q. That does not indicate something is executed, right?
A. No.
Q. It says it came by fax. The E-mail marked as Exhibit J is about 20 minutes prior to that, 22 minutes, it is an E-mail and not a fax. My question to you is, do you know if this is what she is referring to when she made that entry?
A. I don't.
Q. It seems to be the same approximate time frame?
A. Yes.
Q. The document marked Exhibit J is your form of agreement back to you from Mr. Casolo but with some changes in it, correct?
A. Yes.
Q. Do you know what the changes were?
A. May I compare?
Q. You may. To save you time, it does appear that in Paragraph 6 the term of the agreement was reduced down to one year,

Page 86

client to obtain commitments for the financing from the institution." When it says the institution there, that means Laurus, right?
A. Yes, or any other institution.
Q. But Laurus is the institution identified in this letter; is that correct?
A. Yes.
Q. Did IFS at times after June 17, 2004 act as IFS' (sic) agent in negotiations with Laurus on the terms of financing?
A. Restate that, please.
Q. Yes. Did IFS on occasions after June 17, 2004 act as CCI's agent in negotiations with Laurus on the terms of the financing?
A. We discussed the financing terms with Laurus and they effectively said they would give us a term sheet as to their offer on this transaction.
Q. Do you know when in time that occurred relative to that letter? If you need to refer to Exhibit C to answer that, please feel free to do that. I suggest to you I see an entry on 6-21-04. I don't know if that is the first time. I also see an

Page 87

entry on 6-18-04.
A. Yes. We received a proposal letter as it states, 6-18-04. And then there was a second letter that was more complete, as I recall, that ultimately became a commitment once it was accepted by Mark Casolo of CCI.
Q. I understand that means that you or IFS were made aware of certain proposed terms from Laurus. My question to you tracking the language in your authorization term agreement with CCI is whether IFS at any time after June 17, 2004 acted as agent for CCI in negotiations with Laurus over the terms of the financing?
A. Yes, we did.
Q. What did IFS do acting as CCI's agent to negotiate the terms of the financing with Laurus?
A. We determined from Laurus what their lending requirements were on this type of project. Whether they were interested in this type of project. And Laurus indicated that they had a standard program which effectively this might fit into. And that they would do real estate financing out of

Page 88

the country on boutique hotels, whereby they would provide 60 percent of the financing on the basis of acquisition price or appraisal, whichever was less. They said that is kind of our program. Then they indicated what the fee structure would be. They indicated that they would want some kind of equity interest in the transaction, which is something that again as a person in the business for as long I've been in this, it is neither fee stream nor were they taking a risk. So that was basically it.
Q. Do you know if Laurus received the private placement memo that we have marked as Exhibit E that I showed you earlier in this deposition?
MR. MICHAELSON: Objection.
A. I do not know or recall whether they had that private placement memo.
Q. When Laurus made a first proposal to you about the general terms on which they could provide financing as you just described, did that proposal involve the placement of securities?

Page 89

MR. MICHAELSON: Objection.
A. Not to my recollection. It was our understanding that there were securities already outstanding and registered. I knew no more than that.
Q. When Laurus made the first proposal to you on or about June 18, 2004, was that proposal in the form of conventional mortgage financing?
A. It definitely outlined conventional mortgage financing. In their term sheet it outlined all of the terms of how they would lend the money.
Q. Did that term sheet call for Laurus being issued securities in CCI Group in return for financing?
A. I believe that term sheet stated that they wanted a percentage of the equity in the company as a part of the financing transaction.
Q. But based upon your experience in the industry, you recall that proposal otherwise being in the form of a conventional mortgage financing?
A. The major concept was they were going

to lends $10 million plus the additional fees and that they would not put the money out other than on a 60/40 basis. Nothing having to do with securities triggered that. It was strictly the acquisition of the real estate. It was strictly the loan to value ratio and securities had nothing to do with funding of the money. Basically they got additional interest, is what it boiled down to, and none of this had to do with anything other than the percentage of acquisition price and/or the appraisal, whichever was less.
MR. FREEL: Mark this as Exhibit L.
(EXHIBIT L MARKED FOR IDENTIFICATION)
Q. Mr. Herriott, I am now showing you a document I marked as Exhibit L. This shows an E-mail to you from Mark Casolo on June 16, 2004, which is the day before you reached final agreement on the terms of your letter agreement. And it has an Excel spreadsheet attached. Do you recall receiving this information from Mr. Casolo on or about June 16?



A. Yes.
Q. Do you know what it is?
A. It is basically a pro forma cash flow because we had asked for this so we could further verify the viability of the transaction. He sent this on in to us, and this is something we had to give to Laurus.
Q. Was this a pro forma relative to CCI's existing business operations as you understood it or did this assume the business operations of some entity to be acquired in the future?
A. The cash flows appear to be what they are actually producing with the entity that they owned. And I believe they owned one which was the beach house and that is shown in the consolidated pro forma with the others they proposed they were going to purchase. We had some actual and some pro forma.
Q. What did you do with this information?
A. I believe it was transmitted to Laurus.
Q. Did you do that?
A. I don't recall whether I did it or whether Hal Wolfe sent it. I don't recall.



MR. FREEL: Mark this as Exhibit M.
(EXHIBIT M MARKED FOR IDENTIFICATION)
Q. Exhibit M is an E-mail to you from Mr. Regan?
A. Yes.
Q. And that is somebody at Laurus Funds; is that correct?
A. Yes.
Q. And you sent this E-mail to Mr. Regan on June 18; is that correct?
A. Yes.
Q. And said, it was good speaking with you and Eugene, which is also somebody at Laurus, yesterday at CCI. I look forward to returning the term sheet. What do you recall about your telephone call with Mr. Regan and Mr. Grin on June 17?
A. Basically they were going to present us with a term sheet based on all of our conversations.
Q. Other than the general terms you have already told me about, did you discuss what would be in that term sheet?
A. I think that had already been



discussed. Mark Casolo told us that at the original meeting. I think we had discussed that.
MR. FREEL: Mark that as Exhibit N.
(EXHIBIT N MARKED FOR IDENTIFICATION)
Q. Exhibit N is an E-mail to Mark Casolo from Pat Regan with copies to you and Eugene Grin later that same day sending the proposal letter for an investment in CCI Group, correct?
A. Yes.
Q. Do you know if you have the attachment to this E-mail?
A. I would believe so, based on our notes of 6-18 at 5:16 p.m.. This is 6-18 at 4:28, so I would suspect.
MR. FREEL: Mark this as Exhibit O.
(EXHIBIT O MARKED FOR IDENTIFICATION)
Q. This is an E-mail from you to Mr. Wolfe saying, we received a copy of the term sheet from Laurus and are reviewing it and will discuss it with him on Monday the 21st of June; is that correct?

Page 126

Mark Lev.
Q. What individual person did you know of or deal with who was affiliated with Kuma Consulting?
A. I didn't deal with anybody there.
Q. But Mr. Lev has no relationship to that entity, that is your understanding?
A. I don't know that either. He could be affiliated but what the relationship is, I don't know.
Q. Does that percentage break down, does that accurately reflect the way the fees were going to be allocated out between those entities?
A. Yes.
Q. And you are anticipating a receipt of a cash fee in the amount of $400,000; is that correct?
A. $420,000, yes.
Q. The E-mail up above says 400 even, doesn't it?
A. Yes.
Q. So was it 400 or 420?
A. I believe was $420,000.
Q. So you were incorrect in your E-mail to

Page 127

Mr. Casolo?
A. Yes.
Q. Was that the amount calculated by the percentages done on this E-mail?
A. Yes.
Q. Mr. Casolo says this could only be issued to a broker-dealer. The BD has to disburse it from there. Let me know who to issue it to.
A. Yes.
Q. Is that what you were referring to in the previous E-mail we looked at when you indicated to Mr. Regan you had received an E-mail from Mr. Casolo about a broker-dealer?
A. Yes.
Q. To your knowledge, did the transaction close on July 29, 2004?
A. It closed, I believe, yes, the 29th or 30th of July. To my knowledge.
Q. I produced in this litigation to Mr. Michaelson, and I can get it and show you, a binder of closing documents dated July 29, 2004. Have you ever seen that document?

Page 128

A. No.
MR. FREEL: Jeff, would you show him yours?
MR. MICHAELSON: Yes.
Q. This is a this document of closing documents with 12 tabs and it refers to a closing date and there is an index to the closing documents here. Did you ever see this document at any time prior to this lawsuit?
A. No, I didn't.
Q. Are you familiar at all with the terms of the document?
A. Yes, sir.
Q. Generally?
A. Yes.
Q. Were you involved or anybody else on behalf of IFS in negotiating the terms of any of the documents contained in this binder of closing documents?
MR. MICHAELSON: Objection.
A. The only thing we would have had involvement in is the secured portion of the $10 million, which would have been the mortgage on the property.

Page 129

MR. FREEL: Thank you, Jeff.
Q. After the closing occurred, first of all, were you advised on either July 29 or July 30 that a closing had occurred?
A. We found out about the closing at some point after the closing took place, because obviously there was no wire transfer to the account. I believe Mark Casolo gave us some of the insight of what happened at the closing because I couldn't have gotten it from anybody else. He told us he submitted our fee to be disbursed and at the closing it was ripped up by Eugene Grin of Laurus. And, in fact, he was expecting that he was going to get 4 percent of the loan amount for McGinn Smith at the same time. So not only were we hurt, but he was also hurt because that money was not disbursed by Eugene Grin at that time.
Q. This conversation with Mr. Casolo you just described, did that happen sometime within days of the closing?
A. I believe so, yes.
Q. And you called Mr. Casolo?
A. In all probability, yes.

Casolo

A: I had known Fred Jackson and Fred is the founder of the company, and Fred had asked if I would be interested in raising capital for the company or assisting in the finance, their financial needs.

Q: Did he have in mind, at that time in 2002, this idea that they would be in the resort business in effect?

A: Yeah, that was the premise of —

Q: Okay. I'm sorry if I interrupt you at all. Just plow right through me. You're doing fine in terms of not talking two at once, but if I cut you off, I apologize, just raise your hand.

But as of 2002, the premise of the business, as far as you knew, was this kind of membership resort kind of a business; is that fair?

A: Correct.

Q: When Mr. Jackson came to you, did they already — did CCI already have some interest in the Beach House?

A: No.

Q: And I take it that McGinn, Smith was involved in the initial purchase of stock relative



Casolo

to the Beach House property in some manner and received some remuneration; is that true?

Let me — it's a bad question. Let me ask you, again.

Did McGinn, Smith help with the purchase of the Barbuda beach property's Barbuda stock?

A: That was within the scope of our engagement agreement, yes.

Q: Originally?

A: Yes.

Q: Now, the — and you may have to educate me a little.

The private placement memorandum, was this a document which was circulated in an effort to find investors at some point?

A: Well, the goal of it was to raise capital.

Q: But in other words, what I have and what was produced, I can show it to you, but it was marked as Exhibit E in this case. In what you produced, it's a complete document which was out there for the review of potential investors; is that correct?



Casolo

A: Correct.

Q: And if I understand the private placement memorandum, you correct me if I'm wrong, nothing in the private placement memorandum would have resulted in a mortgage, as the term is commonly used, on any real estate in connection with the money which would be raised if this private placement memorandum came to fruition; is that true?

A: Could you —

MR. FREEL: Objection. You could answer.

A: Can you ask that question, again?

Q: Sure.

The private placement memorandum had to do with placing certain stocks or warrants or subordinated notes, correct?

A: Correct.

Q: Okay. But none of the documents in the private placement memorandum, if somebody subscribed to it, would have given that subscriber a mortgage interest in a particular piece of real estate; is that true?

A: That's true.



Casolo

Q: Is it correct to use the term subscribe? If I said to you did anyone subscribe to this PPM, would that be the right term?

A: Yes.

Q: Did anyone subscribe to it?

A: Yes.

Q: Okay. How much, however you want to express it, in terms of dollars? I wanted to know the dollars and the percent of the stock, if you understand the question? It was up to 12 —

A: From when to when?

Q: Oh, well, ever.

MR. FREEL: Objection to the form of the question.

You may answer.

A: There has been approximately 8 million raised through the private placement of subordinated notes.

Q: And do you know, says 12 percent subordinated notes, what does the 12 percent refer to?

A: That's the yield.

Q: And I don't know if I understand this, again, but in conjunction with that

Page 21

*Casolo*

8 million, there were certain shares at stake; is that correct?

A: There are warrants, not shares.

Q: Okay. Along or concurrent with or as part of that $8 million which was raised, do you know the number of shares that those warrants applied to?

A: Approximately 2.4 million.

Q: Okay. So, again, in the most lay terms that I can manage, through the private placement to date, 8 million has been raised, and in exchange, for lack of a better word, for that $8 million, warrants have been issued, which, if exercised, would result in 2.4 million shares of CCI being issued to the people who paid that 8 million?

A: Correct.

Q: Do you know, was that all after May 1st, 2004?

A: No, it was from November through now.

Q: November of 2004?

A: November of 2002.

Q: Okay. But this, I'm just — maybe

Page 22

*Casolo*

there was another private placement memorandum or this one — one is dated May 1st, 2004. Was there one before which had the same terms with a different date or —

A: There were a couple before.

Q: And I just want your testimony to be clear.

The 8 million, does that go all the way back to the date in 2002 you mentioned?

A: That goes back to approximately November 2002.

Q: Okay. Do you know whether — is this the current existing private placement memorandum which is distributed or shown to potential investors or is there one subsequent to this?

A: There's a subsequent.

Q: So — and when I say this, I'm talking about Exhibit E, correct?

A: Correct.

Q: Has there been one subsequent to May of 2004?

A: I believe that's the case.

Q: I don't know if you could tell me

Page 23

*Casolo*

this, but why does one private placement memorandum get superseded by another?

A: Well, there's usually a time stipulation in it.

Q: So they basically expire?

A: Correct.

Q: And do you know the date, maybe I asked you, when the — I'll call it superseding PPM to Exhibit E became effective?

A: I don't recall offhand, no.

Q: Was it after the Laurus closing?

A: I don't recall offhand. I'd have to have the document in front of me, look at the date, to be accurate.

Q: Whenever the date, is it something that you authored?

A: Correct.

Q: And that's, again, as part of your employment at McGinn, Smith pursuant to an engagement letter from CCI?

A: Correct.

Q: And that would be an engagement letter which, as far as you know, would have been signed by Mr. Jackson for CCI?

Page 24

*Casolo*

A: Correct.

Q: Is Mr. Jackson working in Manhattan all the time? Is this his regular full-time employment?

A: It's his regular full-time employment.

Q: Just for CCI or is that just one of his jobs?

A: No, for CCI.

Q: I just want to clarify a few points. It says in Exhibit E that you're a director of the company, being CCI, and you have been since November of 2003. Does that sound about right?

A: Approximately, yeah.

Q: Okay. And then it says as of this date, you had recently been appointed chairman of the company. Does that sound — without getting more specific?

A: Yeah.

Q: And it says that, for what it's worth, McGinn, Smith & Company is an NASD registered broker/dealer. Is that true, to the best of your knowledge?

A: Yes, it is.

Casolo

Q: So Atlantis Strategic Total Return Fund, that's an LLC; is that correct?
A: Correct.
Q: And you're the managing partner?
A: Correct.
Q: Online Capital, Inc. sounds like — that sounds like a — let's see, Online Capital, Inc., is that a fund or broker/dealer?
A: Broker/dealer.
Q: What do you do there?
A: That was sold.
Q: Okay. Was that a job you had while you were employed at McGinn, Smith and —
A: Correct.
Q: And when you say it was sold, were you the sole owner of Online Capital?
A: No, I was a minority shareholder.
Q: And when it was sold, did you no longer have that position as COO?
A: That's correct.
Q: It says here that — I'm not sure how to read this. I'll just show you. On page 33 of the PPM, the very last line of the first paragraph, it says, "And an entity majority owned



Casolo

by McGinn, Smith." I don't know what that refers to.
A: Unlike Online Capital, was majority owned by McGinn, Smith.
Q: That's the one where you had the minority interest?
A: Correct.
Q: And you have no written employment agreement with CCI; is that correct?
A: Correct.
Q: It does say here that you did receive a stock purchase warrant to acquire a million shares at a price of one-tenth of one cent per share; is that correct?
A: Correct.
Q: And that had a five-year exercise window?
A: Yes.
Q: Do you know when that was, when that five-year either began or ended?
A: I believe it was in the fall of 2003.
Q: There's a footnote, again, in Exhibit E, on page 36, that says, "The company



Casolo

anticipates entering into an employment agreement with its president and CEO in the near future and it is anticipated that warrants or options will be included in the package and will change the dynamics of the table" — and it's referring to a table on page 35 — "dramatically."
But I take it that what that footnote anticipated hasn't happened yet, you still don't have an employment agreement with CCI?
A: Correct.
Q: Do you know what the number of issued and outstanding shares are of CCI at this point?
A: 20 million fully diluted.
Q: If I'm reading this correct, I'm going to show you page 43 of Exhibit E, at that time it was 9 million, almost 500,000. Would that number, if this were written today, read 20 million? Is that what —
A: No, that's referring to issued and outstanding shares of common stock. That's not a fully diluted number.
Q: Maybe you can explain it to me. I've seen the term fully diluted, but I obviously



Casolo

don't know what it means.
A: Fully diluted counts warrants and options, as well as the common stock.
Q: Okay. So do you know of that 20 million how many are issued and outstanding as of today?
A: My best guess is 13 to 14 million.
Q: And again, thank you for educating me, which you're doing.
If I have a warrant for a million shares and the fully diluted number was 20 million, but my warrant expired today, tomorrow it would be 19 million, am I understanding it correctly?
A: Correct.
Q: Now, at some point you became aware of a company called Independent Financial Services; is that correct?
A: Correct.
Q: How did that happen?
A: Through a daisy chain starting with Eric Lipetz.
Q: And he is who?
A: Just an acquaintance.

Page 77

**Casolo**

A: That was a negotiated item that they, as a policy on this transaction, didn't feel comfortable exceeding.

Q: Do you know whether or not IFS or anyone acting on its behalf, which would be Mr. Herriott, had discussions about that investment formula with anyone from Laurus?

A: I have no knowledge as to that ɔccurring.

Q: Did you have — do you have any :nowledge that it didn't occur?

A: Not specifically, no.

Q: Did you ever try and get them to udge off the 60 percent?

A: Yes.

Q: You wanted them to budge to a higher ercentage, I take it.

A: I wanted them to go higher and they ıd originally verbally communicated 50 percent.

Q: Ultimately, there was a closing on ly 29th; is that correct?

A: Correct.

Q: And part of that closing was that, I ınk, 10 million and change was put in a

Page 78

**Casolo**

tricted account; is that true?

\: Correct.

ɿ: Has any of that money been hdrawn?

Let me just ask that way, has any of money been withdrawn?

: No.

: It's my understanding that — well, ne ask you. Does CCI pay interest on any of noney in the restricted account?

Yes.

When did they start paying interest?

From the date of the closing.

And is that, I presume, the terms he rate set forth in the closing documents?

Yes. As illustrated here on the sheet, it's prime plus two.

·mail was marked as sition Exhibit No. 5 for fication, as of this date.)

'm sorry, would you repeat your ıestion? I'd like to make sure I answered ect.

ıestion read by the reporter.)

Page 79

**Casolo**

Q: Let me show you what we've marked as Exhibit 5, which this is, again, one of these e-mail trails.

First, Mr. Gomes sent you an adjusted balance sheet for CCI and then you forwarded that e-mail to Mr. Herriott; is that correct?

A: I would believe that to be correct.

Q: Mr. Gomes works at McGinn, Smith?

A: Yes, correct.

Q: Is he one of those people who report to you in your department?

A: He's one of our analysts who works on special projects for me.

Q: Does he work exclusively for you?

A: No.

Q: Is he an employee or on a consulting basis?

A: He's an employee of McGinn, Smith.

Q: You said he's an analyst?

A: Yes.

Q: Does he have a specialty or —

A: No, he's a general analyst.

Q: Do you know what the circumstances

Page 80

**Casolo**

were by which Mr. Gomes provided you with the balance sheet and/or you provided it or forwarded it to Mr. Herriott?

A: It was a work in process and there were constant adjustments being made to the P&L and balance sheet on an ongoing basis.

Q: So if you recall, is this something you asked Mr. Gomes for or did he just happen to give it to you and you happened to pass it —

A: No, he would have worked, at my request, on it.

Q: And do you know why on or about June 22nd, or sometime before, that you requested him to do that?

A: As I say, it was — from the very beginning, this has been a work in process, where the balance sheet and P&L and pro formas were adjusted to reflect the most accurate circumstances that was taking place at the time.

Q: I guess the question then would be, was this requested specifically in connection with trying to get some non-bank financing through Laurus Master Funds?

A: I have no specific knowledge of


Min-U-Script®

Page 85

Casolo

behalf, so it was ongoing.
Q: What things were being negotiated?
A: Well, the term sheet is something that, you know, it's not final till it's final, you know, so the terms of the transaction can change. There were constant updates with respect to the status of different properties that we were contemplating purchasing or being involved with. Massaging of the numbers.
Q: Was the balance sheet which Mr. Gomes prepared, part of that same process?
A: Yes.
Q: And that's one which you sent to Mr. Herriott, correct?
A: Correct.
Q: So the balance sheet, which was part of the constant process of updating, which I guess was related to this negotiation, you sent to Mr. Herriott?
A: Correct.
Q: And that would have been the only reason you can think of that you would have sent it to him was in connection with this relationship which you had relative to getting non-bank

Page 86

Casolo

financing for CCI, correct?
A: Correct.
Q: Do you know whether or not Mr. Herriott was at any point sort of riding shotgun or keeping an eye on deadlines relative to this transaction?
A: To a very limited extent.
Q: And what extent or what did that consist of, to the best of your knowledge?
A: I recall one time getting a phone call and an e-mail with respect to the wiring of a check that's referenced here for the commitment.
MR. FREEL: Exhibit S.
Q: And, in fact, one of the next — when you say here, it's Exhibit S?
A: Yes.
Q: Mr. Regan, among the things he pointed out were "next steps," was a check had to be wired, correct?
A: That's correct.
Q: And in the broadest terms, well, that was one of the things that CCI was required to comply with as a condition of the committee approval; is that fair?

Page 87

Casolo

A: That's correct.
Q: So you have a specific recollection that Mr. Herriott called to make sure that that check was sent; is that —
A: Yes.
Q: Now, if that check hadn't been sent, was it your understanding that that potentially had an adverse effect on this non-bank financing?
A: Well, you have to qualify that. Did it have to be sent in the next 24 hours or 48 hours? No. Was it a condition to proceeding in the process? Yes.
Q: Okay. That's why I say potentially.
A: I just wanted to clarify that.
Q: So that's why I say potentially, if it had never been sent.
A: You never would have closed.
Q: To use a "Ghost Busters" term, "that would be a bad thing"?
A: Sure, unless you went back and renegotiated the transaction, again.
Q: Okay. Now, during the course of — well, let me strike that.
July 29th was the closing, correct?

Page 88

Casolo

A: Correct.
Q: And there were a bunch of documents, we know because we have a closing binder, right?
A: Yes.
Q: Were those documents drafted principally by Laurus?
A: They were, they were drafted by Laurus and reviewed by my counsel.
Q: Your counsel being Mr. Luciano?
A: That's correct.
Q: So everything had been drafted and reviewed prior to the closing on July 29th?
A: Correct.
Q: When you say your counsel, that's CCI, correct?
A: CCI is counsel.
Q: Does Mr. Luciano do any work for McGinn, Smith?
A: No, he does not.
Q: Mr. Luciano, he's in New Jersey; is that right?
A: That's correct.
Q: Did he perform services for CCI prior to this transaction?

Casolo

Q: In terms of the portion of this particular transaction with Laurus, involving anything to do with stocks, whether it's a convertible note or warrant, anything, do you know if Mr. Herriott negotiated or prepared any of the documents?

A: Negotiated is a rather general term. I mean, there were some conversations that took place. I don't know that negotiated is the specific word, though.

Q: Okay. Well then, I don't know either. What do you remember, if anything? Do you remember anything specific about the conversations or —

A: I'm just aware that Dick had communicated on several occasions with Laurus.

Q: And that's something you heard from Dick or from Laurus?

A: No, from Laurus.

Q: And do you know the specifics of what those communications were or you just know that he was in touch with them?

A: I mean, the conversations that I had, I mean, Pat Regan had told me that Herriott



Casolo

called three times a day, and two out of the three calls were when he was going to get paid and one was following up if there's anything lacking, anything needing to be done.

Q: Two out of three; so one out of three were not, when am I going to get paid?

A: Yeah.

Q: Okay. Just checking the math. Let me go to the closing binder for a minute. I didn't copy the whole closing binder.

MR. MICHAELSON: Did you bring it?

MR. FREEL: I've got one with me that he can refer to. And it is not marked as an exhibit at this point, right?

MR. MICHAELSON: No, and, off the record.

(Discussion held off the record.)

MR. MICHAELSON: Let's mark this one next in order.

(Joint Instructions was marked as Deposition Exhibit No. 7 for



Casolo

identification, as of this date.)

MR. MICHAELSON: Exhibit 7, I'll make the representation, I took it out of the closing binder, which was provided by CCI's counsel, and at the pages which — it's actually CCI page 101 and 102, that's joint instructions which are actually signed and accepted and agreed by Laurus Master Funds.

Q: Would you agree with that?

A: Yes.

Q: And that one, as we discussed earlier, doesn't say anything about 420,000 to IFS or to McGinn, Smith, correct?

A: Correct.

Q: And the closing binder made reference to — I'll just give you an example.

(Document was marked as Deposition Exhibit No. 8 for identification, as of this date.)

Q: I'm just going to show you a page that's out of a multi-page closing binder, and it has the Bates stamp CCI 00070. Talks about



Casolo

broker's fee in Section 11.12.

Do you see that? Paragraph 11.12 is entitled, "Broker's Fee." Do you see where I'm looking?

A: Yes.

Q: And it makes reference to a schedule 11.12 as the place where you would refer if you wanted to see what fees or commissions were paid? Do you see that?

Do you see it says, "Except as otherwise provided in schedule"?

A: Yes.

Q: And then I'm going to show you Schedule 11.12.

MR. MICHAELSON: I guess this should be number 9.

(Document was marked as Deposition Exhibit No. 9 for identification, as of this date.)

Q: Then exhibit, Schedule 11.12, which is Bates stamped CCI 00087, that does indicate the company's obligated to pay McGinn, Smith and Independent Financial Services each a 4 percent commission on the funding resulting from this

Page 113

Casolo

agreement?

A: Correct.

Q: That's what it says, okay. And Independent Financial Services also is entitled to common stock warrants to acquire 2 percent of the issued and outstanding common stock of the company. Did I read that correctly?

A: That's correct.

Q: Was it your understanding going into the closing that that's accurate, that Schedule 11.12?

A: Yes.

Q: And do you today believe that Independent Financial Services is entitled to a 4 percent commission on the funding resulting from the agreement?

A: Personally, no.

Q: Personally, you don't believe so?

A: No.

Q: And what's the basis for that belief?

A: Well, number 1, they made a proposal to Laurus that was different than what was accepted. Number 2, Eugene Grin's subsequent

Page 114

Casolo

comments to me were that they didn't earn a fee respective of a 4 percent commission and that he would prefer that I not pay that fee and that they did very little to facilitate the transaction.

Q: Anything else?

A: He was just steadfast in his position there.

Q: Is there any other reason that you believe that they're not entitled to that fee?

MR. FREEL: Objection. Go ahead.

A: Then, subsequent to, prior to the closing, but subsequent to many events, I receive a letter instructing payment of the fee to be wired to six different people, and I made a comment back that I can't make a payment to six different people, that a payment can only legally be made to a broker/dealer in connection with the services that were rendered, and consequently, whoever their broker/dealer was, would have to make any payment out to anybody on their side of the transaction, and that I would not be involved in that because state law and federal law is very specific in that regard, that no fee is to be paid

Page 115

Casolo

for the sale of securities if you're not a licensed broker/dealer.

Q: Did I understand you to say that you agreed they were entitled to the money, but you had to pay it to their broker/dealer?

A: No, as the original sheet had stated, there was a 4 percent fee due to them. It wasn't until just prior to the closing that it became or I became aware of the fact that they weren't a registered broker/dealer, and there are a whole confluence of events, that, the combination of Laurus saying they objected to their being paid, and there were just any number of things that collectively impaired the situation.

Q: Okay. So when and how did you become aware that IFS was not a registered broker/dealer?

A: Because when I received the e-mail stating the different parties that had to be paid, I responded back that I could only make the payment to the broker/dealer, I couldn't make it to the individuals.

Q: I'm sorry. I think you said that

Page 116

Casolo

backwards or did I hear it backwards?

A: No, that a payment could only be made to the broker/dealer, not to the individuals.

Q: And that was because you concluded that the payment was a commission on the sale of stock?

A: That's exactly what it was.

Q: Okay. And so that was your conclusion?

A: Yes.

Q: That's the basis for that conclusion?

A: That's correct.

Q: And what was your — the basis of your believing that IFS was a registered broker/dealer prior to that?

A: Going back to initial conversations where they put together securities and product transactions to bring to their network of independent insurance agents.

Q: So it was based upon the conversation that we discussed at the beginning of the deposition?

A: That's correct.

**CCI GROUP, INC. AND CERTAIN OF ITS SUBSIDIARIES**
**MASTER SECURITY AGREEMENT**

(8)

To: Laurus Master Fund, Ltd.
c/o Ironshore Corporate Services, Ltd.
P.O. Box 1234 G.T
Queensgate House
South Church Street
Grand Cayman, Cayman Islands

Date: July 29, 2004

To Whom It May Concern:

1. To secure the payment of all Obligations (as hereafter defined), CCI GROUP, INC., a Utah corporation (the "Company"), each of the other undersigned parties (other than Laurus Master Fund, Ltd, "Laurus")) and each other entity that is required to enter into this Master Security Agreement (each an "Assignor" and, collectively, the "Assignors") hereby assigns and grants to Laurus a continuing security interest in all of the following property now owned or at any time hereafter acquired by any Assignor, or in which any Assignor now have or at any time in the future may acquire any right, title or interest (the "Collateral"): all cash, cash equivalents, accounts, accounts receivable, deposit accounts (including, without limitation, the Restricted Account (the "Restricted Account") maintained at North Fork Bank (Account Name: CCI Group, Inc., Account Number: 2704052030) referred to in the Restricted Account Agreement), inventory, equipment, goods, documents, instruments (including, without limitation, promissory notes), contract rights, general intangibles (including, without limitation, payment intangibles and an absolute right to license on terms no less favorable than those current in effect among our affiliates), chattel paper, supporting obligations, investment property (including, without limitation, all equity interests owned by any Assignor), letter-of-credit rights, trademarks, trademark applications, tradestyles, patents, patent applications, copyrights, copyright applications and other intellectual property in which any Assignor now have or hereafter may acquire any right, title or interest, all proceeds and products thereof (including, without limitation, proceeds of insurance) and all additions, accessions and substitutions thereto or therefore. In the event any Assignor wishes to finance the acquisition in the ordinary course of business of any hereafter acquired equipment and have obtained a commitment from a financing source to finance such equipment from an unrelated third party, Laurus agrees to release its security interest on such hereafter acquired equipment so financed by such third party financing source. Except as otherwise defined herein, all capitalized terms used herein shall have the meaning provided such terms in the Securities Purchase Agreement referred to below.

2. The term "Obligations" as used herein shall mean and include all debts, liabilities and obligations owing by each Assignor to Laurus arising under, out of, or in connection with: (i) that certain Securities Purchase Agreement dated as of the date hereof by and between the Company and Laurus (the "Securities Purchase Agreement") and (ii) the Related Agreements