UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

INDEPENDENT FINANCIAL           )
SERVICES, INC., Plaintiff,      )
                                )
                                )
v.                              )   C.A. No. 04-378L
                                )
                                )
CCI GROUP, INC., Defendant.     )
                                )

DECISION AND ORDER

Ronald R. Lagueux, Senior United States District Judge.

This case is before the Court for decision following a non-jury trial on the Complaint filed by Independent Financial Services, Inc. ("IFS") against CCI Group, Inc. ("CCI"). In this case, Plaintiff seeks to recover damages for breach of contract and tort claims which are incidental to the contractual relationship. A bench trial was held on June 7 and 8, 2006. After reviewing the trial testimony, the exhibits and the parties' post-trial briefs, the Court now renders a decision in this case in favor of Plaintiff and determines the amount of damages that Plaintiff is entitled to recover.

I. Facts

In the spring of 2004, Mark Casolo, the chairman of CCI, was looking for funding of approximately $25 million for a new project. CCI was in the business of owning and operating resort hotels and was looking to expand its operations with a line of

1

boutique resort properties. Casolo had prepared a Private Placement Memorandum ("PPM") and was shopping it around to private and institutional investors. One of the investors Casolo contacted on his own initiative was Eugene Grin from Laurus Master Fund, Ltd. ("Laurus"), an off-shore fund that is part of the Laurus family of funds based in New York.

Not long after that, in May 2004, Casolo was introduced to Richard Herriott of IFS by Hal Wolfe, who runs his own financing consulting firm. Herriott is the president of IFS, a corporation in the business of providing financial advice and assistance in obtaining financing for various enterprises. Wolfe represented to Casolo that Herriott enjoyed a close relationship with a number of financing institutions, including Laurus, and could help CCI obtain the financing it wanted.

Before entering into detailed discussions of what IFS could do for CCI, Casolo and Herriott signed a Confidentiality and Non-Disclosure Agreement. In that agreement, a non-circumvent clause indicated that the parties were

> (i) not to deal, directly or indirectly, with any person, firm or entity introduced by one Party to the Other without the prior written consent of the Introducing Party, (ii) not to circumvent each other in any manner, and (iii) not to participate in or enter into any transaction, Agreement, development or business activity of the other Party without such Other Party's written consent, and (iv) not to participate in business dealings that would adversely impact advantageous business relationships with the Parties.

(Ex. 1 at 2.) Casolo then forwarded the PPM he had prepared

concerning the boutique resort project to both Herriott and Wolfe. In fact, many of the communications between Casolo and Herriott were copied to Wolfe; the three obviously were working in concert to finalize both the IFS/CCI agreement and the financing transaction between CCI and Laurus.

IFS and CCI entered into a written agreement on or about June 17, 2004. The language of the contract describes IFS's obligation to act as agent for CCI in negotiating and obtaining a financing commitment for CCI:

> IFS is hereby appointed as Agent, for a period consistent with the current negotiations with the Laurus Funds and otherwise through August 17, 2004 to negotiate on behalf of Client to obtain commitments for the Financing from the institution(s)("Lender" or "Financial Source"), to be specified upon return receipt of this Terms Agreement and other items specifically requested in this Agreement. This Agreement will become Exclusive upon receipt of reasonable Lender Letter of Interest to provide project funding for the period of time and if a lender requests exclusivity to complete their "due diligence."

(Ex. 9 at 1.) In exchange for these services, CCI agreed to compensate IFS with a placement fee of 4% of the "Gross Loan Amount" and an equity participation of 2% of CCI's common stock on the date of closing. (Ex. 9 at 2.)

On June 17, 2004, just as Herriott and Casolo were finalizing the terms of the IFS/CCI agreement, Herriott, Wolfe, and Casolo had a phone conference with Laurus representatives Pat Regan and Grin concerning the boutique resort project. In an email Herriott sent Regan after the call, Herriott referred to

3

the fact that basic terms of a CCI/Laurus agreement were agreed to during the phone conversation and would be memorialized in a "Term Sheet" produced by Laurus. Regan responded to Herriott's email by resending the "Term Sheet" he had earlier emailed to Casolo, Grin and Herriott.

On June 24, 2004, Casolo, Wolfe, and Herriott met with Laurus representatives Regan and Grin in Laurus's New York offices. Casolo testified that he did all of the negotiating at this meeting with Grin, and that Wolfe and Herriott did not contribute to the discussion. Herriott's and Grin's accounts of this meeting generally support this description and confirm that the negotiations were primarily conducted by Casolo and Grin.

In the first week of July 2004, Regan notified Casolo that the CCI proposal received committee approval and that the next steps involved conducting due diligence, receiving a deposit from CCI, finalizing legal documentation, and other such prerequisites. Herriott testified that, following committee approval, he worked with Casolo to prepare the documents required of CCI and that he coordinated the work of independent parties to fulfill Laurus's requests. Indeed, emails indicate Herriott directly communicated with Regan from Laurus concerning CCI's deposit and fulfilling Laurus's requirements before closing.

Ultimately, the loan closing was scheduled for July 29, 2004. In the week leading up to the closing, Herriott and Regan

exchanged emails in which Herriott provided wire transfer information to allow Laurus to wire IFS's commission upon closing and Regan responded by requesting the information in a different format, which Herriott duly provided. Casolo also prepared and faxed to Herriott a document called Joint Instructions which presumed to direct the escrow agent to disburse the Laurus funds in part to IFS for fees, as well to other entities for various fees.

The transaction did indeed close on July 29, 2004, with a final loan amount of $10.5 million. After fees to Laurus were deducted, the net of approximately $10.1 million was deposited into a restricted account under CCI's name at North Fork Bank in New York. As part of the closing, Laurus and CCI signed an agreement which established that the account was "in Laurus's sole dominion and control" and that disbursements from that account could only be made on notice from Laurus. (Ex. 27 at 1.) In another agreement signed at the closing, the parties defined the formula CCI would have to perfect in order to gain Laurus's consent to use the restricted account funds. In essence, Laurus would only allow disbursements for the purchase of properties it approved of, and then only for no more than 60 percent of the property's value, for which sum Laurus would be granted a first priority mortgage.

Not long after the closing, Herriott learned that Grin had

insisted that Laurus funds not be used for fees to IFS and that the Joint Instructions faxed to Herriott were not the operative instructions submitted at the closing. Accordingly, no money was transferred to IFS or Herriott upon closing, and CCI did not independently forward any funds to IFS or Herriott.

In September 2004, Laurus released $5.1 million from the restricted account to CCI, which funds CCI used to buy a resort in Barbuda that it had been leasing with an option to buy. At that time, Laurus did not get a mortgage interest in the property; however, in January 2006, Casolo refinanced the property and gave Laurus a priority mortgage for the amount withdrawn from the restricted account.

After the September 2004 disbursement, CCI proposed several acquisitions to Laurus for use of the remaining funds, but Laurus rejected each of them. In January 2005, Casolo returned the remaining funds to Laurus, in the amount of slightly less than $5 million, incurring a one percent penalty. In January 2006, CCI obtained additional financing from Laurus in the sum of about $6 million.

IFS filed suit in this Court on September 1, 2004 seeking damages for the failure of CCI to pay the fees agreed to in the IFS/CCI agreement of June 17, 2004. The Complaint in this case included four counts: (I) breach of contract, alleging that CCI did not pay IFS as required by the agreement; (II) constructive

trust, seeking to have the Court impose a constructive trust on the loan proceeds to the extent that they were the property of IFS; (III) specific performance, seeking to compel CCI to issue stock as provided in the agreement; (IV) tort claims, including fraud, breach of fiduciary duty and interference with advantageous business relations.

## II.  Discussion

Neither party disputes the existence of an agreement between IFS and CCI, or that the document entered into evidence as Exhibit 9 is the written articulation of the parties' agreement. Moreover, the parties agree that Rhode Island law governs the determination of this dispute.

In its Post-Trial Memorandum, Defendant has not renewed its argument that the IFS/CCI contract is voidable pursuant to § 29(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78cc(b), because Plaintiff is not a registered broker/dealer as required by § 15(a)(1) of the Act.  The Court denied Defendant's Motion for Summary Judgment on this claim after a hearing on November 15, 2005, in part because the proper format for a claim seeking rescission of a voidable contract had to be by a separate action or counterclaim and Defendant's attempt to assert it as an affirmative defense was procedurally defective.  The Court then denied Defendant's Motion for Leave to File Counterclaim after a hearing on May 10, 2006 because making such a request after

discovery had closed prejudiced Plaintiff's ability to assert equitable defenses to that claim.  In its Post-Trial Memorandum, Defendant concedes that the sole issues before the Court are whether there was a breach of contract by Defendant for not paying the fees and what the appropriate measure of damages is if a breach was committed.  Consequently, the question of contract voidability is no longer before this Court.

With regard to the tort claims made by Plaintiff - namely, fraud, breach of fiduciary duty and interference with advantageous business relations - none has been sufficiently developed by Plaintiff or adequately supported by evidence submitted at trial to sustain a verdict for Plaintiff.  In its Pre-Trial Memorandum, Plaintiff cites Rhode Island law on fraud/misrepresentation and punitive damages, but does not explain how these general precepts apply to the facts of this case.  Plaintiff then briefly contends in its Post-Trial Memorandum that CCI's failure to advise IFS that it agreed to pay Casolo's employer a fee that was inconsistent and in interference with IFS's right to a fee constitutes "actionable tort."  IFS further argues that CCI's concluding the transaction with Laurus in a manner inconsistent with IFS's reasonable belief that it would be paid by wire transfer at the closing similarly constitutes an unspecified "actionable tort."  These two contentions are the sum total of Plaintiff's argument concerning

8

the torts alleged to have been committed in this case. The Court concludes that Plaintiff has failed to prove its tort claims.

Moreover, because Plaintiff's recovery for any injury caused by these torts would not exceed the damages Plaintiff seeks for Defendant's contract breach, and because the Court finds Defendant did indeed breach the contract, there is no need to delve any deeper into these claims. Plaintiff makes a half-hearted request for punitive damages in its Pre-Trial Memorandum, but does not renew the claim in its post-trial papers. Even if Plaintiff had continued to press its claim for punitive damages, the Court simply does not see the malicious, wanton, or extreme conduct in this case that would justify an award of punitive damages. Therefore, the damages sought pursuant to the tort claims in this case could not exceed compensation for the loss resulting from Defendant's failure to pay Plaintiff as promised in the contract. Because duplicate recovery for the same underlying behavior is prohibited, <u>Vallinoto v. DiSandro</u>, 688 A.2d 830, 842-43 (R.I. 1997), Plaintiff gains nothing in this instance by pressing its tort claims.

Consequently, the only issues before this Court are whether Defendant committed a breach of its contract with IFS and the extent of the damages resulting from that breach.

**1. Breach and Substantial Performance**

Because Defendant does not dispute that a contract bound the

9

parties, the sole inquiry for the Court is whether Plaintiff performed its obligations sufficiently to entitle it to compensation under the agreement. It is basic contract law that a party cannot recover under a contract unless it has substantially performed its promised obligations. DiMario v. Heeks, 351 A.2d 837, 838 (R.I. 1976). Under Rhode Island law, substantial performance is a fact-dependent inquiry which the fact-finder must resolve considering all relevant evidence. Nat'l Chain Co. v. Campbell, 487 A.2d 132, 135 (R.I. 1985). The doctrine of substantial performance is most often involved in the construction context, but the concept is applicable to contracts of all kinds, including those for the rendering of personal services. Russell v. Salve Regina Coll., 938 F.2d 315, 318 (1st Cir. 1991)(citing 3A Corbin, Corbin on Contracts § 701 at 312-13 (1960)).

Between June 17, 2004 and August 17, 2004, the contract period, the services required of IFS were negotiating with Laurus or other lenders on behalf of CCI, and obtaining commitments for financing or reasonable letters of interest from lending institutions. It is these acts-negotiating or otherwise obtaining financing-that constitute performance according to the contract agreed to in this case. Whether IFS substantially performed these tasks requires an examination of the evidence submitted of IFS activities on behalf of CCI.

10

IFS maintains that it "obtained and forwarded documents, shepherded the transaction, assured that CCI provided Laurus with whatever documents Laurus needed, and otherwise undertook its efforts in good faith with appropriate diligence." (Pl.'s Post-Trial Mem. 6.) The documentary evidence supports IFS's contention. The email exhibits submitted by IFS evidence direct communications between Laurus and IFS, as well as Casolo and IFS, all in furtherance of the CCI/Laurus deal. In one email, Herriott refers to a phone conference between Herriott, Wolfe, Casolo, Regan and Grin in which the basic terms of a CCI/Laurus agreement were worked out and would be memorialized in a "Term Sheet" produced by Laurus. Regan responded by resending the "Term Sheet" he had earlier emailed to Casolo, Grin and Herriott. This series of exchanges indicates clearly that Herriott participated in substantive negotiations concerning the financing deal.

A few days after the phone conference between CCI, IFS and Laurus, Casolo sent Herriott an email with a CCI balance sheet attached. Later in the process, Herriott reassured Laurus representative Regan in an email that CCI would soon submit its deposit, one of the required steps for the loan to go forward after approval by the financing committee. These communications give substance to IFS's claims that it shepherded the transaction both before and after a CCI/Laurus agreement was reached and that

11

it obtained and forwarded documents to ensure that CCI complied with Laurus requirements.

CCI does not dispute that when Laurus's investment committee approved the loan to CCI on or about July 6, 2004, the commitment referred to in the IFS/CCI agreement was achieved. Rather, it argues that IFS did nothing to obtain that commitment from Laurus because it did not initiate contact with Laurus, it did not aid in the negotiations with Laurus, nor did it attend the closing. (Def.'s Post-Trial Mem. 2-3) CCI contends that Herriott's sole contribution to the financing deal was attending a single meeting in New York and sitting at one end of a conference table while Casolo and Grin negotiated the terms of the deal on the other end. It is clear from the evidence that IFS did not introduce CCI to Laurus; however, CCI cannot maintain that it expected such an introduction as part of the deal it contracted for with IFS when the record is clear it reached its agreement with IFS well after discussions with Laurus had already begun. In addition, the email exchanges between Herriott and Regan and Herriott and Casolo belie CCI's claim that IFS had nothing to do with the negotiations that ultimately resulted in a financing deal for CCI. Finally, IFS's absence from the closing between CCI and Laurus is immaterial in determining whether IFS did what it promised for CCI, that is, negotiate or obtain a commitment for financing for CCI's resort project.

It is clear to this Court that IFS performed its obligations sufficiently to entitle it to compensation under the agreement and that CCI, therefore, breached its obligation to pay IFS fees for its services. What remains for the Court to determine is the amount of damages payable to IFS.

## 2. Damages

It is well settled that the object of an award of damages for breach of contract is to place the injured party in as good a position as if the parties had fully performed the contract. Guzman v. Jan-Pro Cleaning Sys., Inc., 839 A.2d 504, 508 (R.I. 2003). In this case, IFS seeks compensatory damages in the amount of $420,000, or 4% of the amount of the "Gross Loan Amount," $10.5 million, as a remedy for CCI's breach of the cash compensation portion of the agreement. IFS further contends that it is entitled to specific performance of CCI's promise to issue 2% of its common stock to IFS as of the date of closing.

CCI does not dispute that the formula for the award of damages is spelled out in the agreement exactly as IFS describes. Rather, CCI argues that the loan amount used in calculating IFS's commission should be the portion of the loan actually used by CCI, that is, $5.1 million, and not the $10.5 million Laurus initially authorized. Calculating IFS's fee in this way produces the amount of $204,000.

Because Laurus had control over the restricted bank account

and CCI could not withdraw funds from that account without the signed release of Laurus, the funds deposited in the account cannot represent the total loan amount. Rather, the initial investment from Laurus benefitted CCI in the amount of $5.1 million, and that is therefore the "Gross Loan Amount" that must be used to calculate IFS's fee. Accordingly, CCI owes IFS $204,000 as compensation for the failure to pay the agreed-upon fee, plus interest.

As for the common stock, courts generally will not order specific performance of an agreement to sell stock where there is an adequate remedy at law. Shunney v. R.I. Hosp. Trust Co., 96 A.2d 828, 830 (R.I. 1953). Similarly, where there have been no allegations that the value of the stock was uncertain and not easily ascertainable, courts have found that money damages are the appropriate remedy. Id. In this case, the value of the shares promised by CCI is readily ascertainable and no allegations have been made that money damages would be inadequate. Therefore, specific performance of the promise to transfer 2% of CCI's common stock at the time of closing is not appropriate in this instance.

In his testimony, Casolo stated that the number of fully diluted shares of CCI at the time of closing was approximately 12 million. IFS contends that the approximate value of those shares was $1.25 per share, which it supports with a publicly available

14

historical stock price document, admitted at trial as Exhibit 39. CCI does not dispute this valuation, and therefore the Court calculates the damages due IFS at the rate of $1.25 per share for 240,000 shares (2% of 12 million). Accordingly, CCI owes IFS $300,000 plus interest as compensation for CCI's failure to transfer 2% of its common stock at the time of closing.

### III. Conclusion

For the foregoing reasons, the Court hereby renders a decision in favor of Plaintiff IFS and awards it damages in the total amount of $504,000 plus interest. The Clerk shall enter judgment for Plaintiff in the amount of $504,000.00 plus 12% per annum interest calculated from July 29, 2004 (the date of closing) to this date on Count I of the Complaint, and judgment for Defendant on Counts II, III and IV of the Complaint.

It is so ordered.

Ronald R. Lagueux
Senior United States District Judge
October 24, 2006